No. 85,544

STATE OF KANSAS, *Appellee*, v. GRANT B. GROSCHANG, *Appellant*.
(36 P.3d 231)

Opinion filed December 7, 2001.

*Randall L. Hodgkinson*, deputy appellate defender, argued the cause, and *Reid T. Nelson*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, were on the briefs for appellant.

*Constance M. Alvey*, assistant district attorney, argued the cause, and *Nick A. Tomasic*, district attorney, and *Carla J. Stovall*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LOCKETT, J.: This is a direct appeal from a conviction of first-degree premeditated murder. Defendant was sentenced to life imprisonment, 25 years without parole. Defendant claims the trial court erred by (1) not allowing the defense to call a rebuttal witness; (2) failing to hold a competency hearing; (3) admitting the defendant's statements to police; (4) failing to instruct on lesser included offenses; (5) admitting a gruesome videotape; (6) finding the first-degree premeditated murder statute and corresponding jury instruction are not unconstitutionally vague because first-degree murder is indistinguishable from second-degree murder; (7) allowing the State's psychiatrist to testify about statements by and tests performed on the defendant which occurred during a mental examination conducted without *Miranda* warnings; and (8) failing to read back testimony in response to a jury request.

In the early morning hours of July 26, 1998, the defendant, Grant Groschang, and Lisa Thompson drove to the Wyandotte County fairgrounds to kill Julie Bellaart. Bellaart, who had a booth at the fair, had decided to spend the night in her car on the grounds rather than make the trip back early the next morning to set up her booth. Bellaart rented a house that Thompson and others lived in with her. Groschang, who once lived in the house, was planning to move back in. Bellaart had neglected to pay the utilities and the telephone bill and to buy food, even though the house members had paid for these expenses. As a result, the other house members were unhappy with Bellaart.

In anticipation of moving back into Bellaart's house, Groschang obtained forms to apply for a protection from abuse order against Bellaart. Groschang thought that the ex parte order would restrain Bellaart, who was in love with him, from living in the house when he moved back in with Thompson. He wanted Bellaart out of the house because Bellaart would "get in the way of [his] going out with anybody else 'cause she always got in the middle of it, tried to get in the middle of whatever [he] was involved in."

On July 24, 1998, Bellaart's tenants and Groschang met at the house. The group expressed frustration as to how Bellaart was running the house. Groschang determined that the protection order he had considered applying for would not adequately meet his needs because Bellaart would go "ape shit" when she found out. Groschang and Thompson whispered about a plan to kill Bellaart. Groschang then made several references to the group regarding putting a "cap" in Bellaart. Thompson told Groschang it would be "silly" to do because he would get caught.

When Groschang and Thompson left the house in his pickup truck to get coffee, Groschang took his .357 Magnum. Groschang, who had heard that a milk jug could be attached to the end of the gun to make a silencer, brought a milk jug with him. It was raining. Because the back window of the truck was broken, they drove to Groschang's house and got into his van. They then drove to the QuikTrip for gas and coffee and then to the Wyandotte County fairgrounds where Thompson directed Groschang to Bellaart's car.

Groschang got out of the van, climbed over a fence to get to the driver's side of Bellaart's car. He opened the door and shot Bellaart in the head five times. Groschang and Thompson then left the scene. Along the highway in Kansas City, Kansas, they threw out the window the milk jug and a shirt Groschang had used to keep the gun dry.

The next morning, friends went to the fair grounds to help with Bellaart's booth. They noted that Bellaart was not at the booth. When the friends checked Bellaart's car, they found her dead.

The investigation led to the arrest of Thompson and Groschang. Thompson pled no contest to voluntary manslaughter of Bellaart. Groschang gave a statement to the police, confessing to the crime.

Groschang pled not guilty and at trial asserted defenses of mental disease or defect, voluntary intoxication, and involuntary intoxication. Groschang was convicted of premeditated murder. This appeal follows.

### Refusal to Allow the Defense to Call a Rebuttal Witness

An appellate court's standard of review regarding a trial court's admission of evidence, subject to exclusionary rules, is abuse of discretion. Judicial discretion is abused when judicial action is arbitrary, fanciful, or unreasonable. If reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion. One who asserts that the court abused its discretion bears the burden of showing such abuse of discretion. *State v. Lumley*, 266 Kan. 939, 950, 976 P.2d 486 (1999).

Groschang's defense was that his mental state was profoundly affected by his erratic use of a prescribed antidepressant, Zoloft, and in this altered mental state, he was unable to form the requisite intent for criminal responsibility. Both the defense and the State presented expert evidence on Groschang's mental state at the time of the murder.

The defense witness, Dr. Ronald Shlensky, testified that, generally, Zoloft is well tolerated and helpful to alleviate depression in the majority of people who take the drug. However, if a person has a slightly sensitized brain because of an early life brain injury, he or she may be more likely to experience adverse effects from antidepressants such as Zoloft. Included in the list of adverse effects is a change in personality, increased aggression, grandiose ideology, irritability, and a feeling of "specialness." In sensitized people, the antidepressant may activate the manic side of manic-depressive disorder. With certain antidepressants, including Zoloft, erratic use results in "discontinuation syndrome." According to Dr. Shlensky, people with sensitive brains who have "discontinuation syndrome" have been known to perpetrate uncharacteristic "violent acts." Dr. Shlensky had examined and tested Groschang; reviewed his family, medical, and social history; and determined that it was probable that Groschang's brain was sensitive to the effects

of antidepressants and his erratic use of the drug caused him to suffer from a "discontinuation syndrome."

Dr. J.L.L. Fernando from Larned State Security Hospital, who had evaluated Groschang for the State, testified at trial regarding Groschang's mental state at the time of the crime and in a report admitted into evidence that stated:

"With reference to the event which occurred on or around July 26, 1998, . . . the information available in the reports submitted from the Wyandotte County District Attorney's Office (police reports, co-defendant's statement, Mr. Groschang's statement) coincide with the account given by Mr. Groschang during his stay at SSH. The description given in these reports and the description given by Mr. Groschang, during the time period in question, do not convey information about, or descriptions of his functioning, which indicate Mr. Groschang was experiencing symptoms of a psychotic disorder (command hallucinations, disoriented behavior or delusional beliefs) which would have impaired his ability to know the nature and quality of his acts or distinguish between right and wrong. In fact, Mr. Groschang has described his reasoning processes whereby he decided to 'kill her' (the victim). He spoke of the incident, not as an impulse, but something for which he maintained on task for at least forty-five minutes (Mr. Groschang had driven his vehicle in the rain for at least forty-five minutes from Kansas City, Missouri, to Wyandotte County to reach the fair grounds where the victim allegedly slept in a car). During the forty-five minutes prior to the incident Mr. Groschang denied experiencing command hallucinations or delusional beliefs which were directing or controlling his behavior. He described himself as being in a 'rage.' Prior to the time of the incident, he considered options available to him to ensure that he would not be caught or detected. He also planned an alibi. (Reports indicate Mr. Groschang, with his co-defendant, planned to inform others if the need arose that they were at Perkins Restaurant at the time period of question.) Thus, after reviewing all the available data, the staff concluded that the information does not reflect a description of his functioning which would indicate that during the time period in question Mr. Groschang had experienced symptoms of a psychotic process (delusions or hallucinations) which impaired his ability to know the nature and quality of his act or distinguish between right and wrong. Therefore, it is the opinion of the staff that Mr. Groschang was not experiencing any symptoms of a major mental illness (disease of the mind) on or around the time period in question which would have indicated he 'lacked the mental state' required as an element of the offense charged."

During the trial, certain witnesses were asked by the prosecutor if they had taken or were taking Zoloft and, if so, whether they had suffered adverse effects from the drug. Thompson, the codefendant who had previously pled no contest to voluntary manslaugh-

ter, testified that she had taken Zoloft and that she had not suffered adverse effects. William Crumpton testified that Bellaart had been on medication and that Bellaart and Groschang had the same doctor. The defense attempted to rebut this testimony by requesting leave to call a lay witness who had taken Zoloft to testify he had suffered adverse effects, including thoughts of murder without fear, appreciation of human life, or appreciation of consequences. The trial court denied defense's request to introduce the rebuttal witness testimony stating:

"I've been thinking about this since it was first brought to my attention earlier this morning and I do not believe that that testimony would be relevant to this particular case. I think that Dr. Shlensky presented expert testimony regarding that and what could happen and his opinion as to what was going on in the defendant's head when this was all going on. And what somebody else's reaction to it would have been is certainly not relevant to the issues in this case."

Groschang contends that the trial judge abused his discretion in denying him the opportunity to rebut the State's evidence that two people associated with the case had used Zoloft without adverse effect, which implied to the jury that the drug could not have adversely affected Groschang's mental state. Groschang argues that, in light of the testimony elicited by the State, evidence of an adversely affected lay witness was relevant and corroborated Dr. Shlensky's conclusion that Groschang had suffered discontinuation syndrome. To support this assertion, defendant points out that during deliberations the jury requested to see the Zoloft entry in the Physician's Desk Reference (P.D.R.). We note that the pages of the P.D.R. the jury received did not contain information regarding discontinuation syndrome. Therefore, the P.D.R. did not provide corroboration of Dr. Shlensky's testimony, and the defense did not object but had agreed to the portions of the P.D.R. that were sent to the jury.

To support his argument, Groschang relies on *McKissick v. Frye*, 255 Kan. 566, 578-79, 876 P.2d 1371 (1994) (where one party introduces an inadmissible fact into evidence, the other party may introduce a similar inadmissible fact to remove an unfair prejudice which might otherwise result); *State v. Thompkins*, 263 Kan. 602, 624, 952 P.2d 1332 (1998) (where defendant opens a subject on

direct or cross-examination, the State may develop and explore various phases of that subject); *State v. Macomber*, 241 Kan. 154, 158, 734 P.2d 1148 (1987) (if collateral or indirect testimony is introduced without objection, it is error not to allow the defendant to show such testimony is false); and *State v. Humphrey*, 252 Kan. 6, 14, 845 P.2d 592 (1992) (it is fundamental to a fair trial that the accused be afforded the opportunity to present his or her theory of defense to the charge so the jury may properly weigh the evidence and reach its verdict).

The prosecutor's questions of witnesses regarding their personal experience with Zoloft were not relevant to an issue at trial. However, no objection was made to admission of this evidence by the defendant. Under the circumstances, was the denial of Groschang's request to admit rebuttal testimony of a witness who had taken Zoloft and had suffered effects similar to the effects Groschang alleged within the judge's discretion?

We note that the judge's denial of the request did not prohibit Groschang from asserting his theory of defense (see *Humphrey*, 252 Kan. at 14.) Dr. Shlensky had adequately and effectively communicated to the jury that Zoloft's alleged effects on Groschang were rare but within the scope of adverse effects reported in the literature and observed by him in his private practice. The evidence Groschang sought to introduce did not rebut false evidence presented by the State (see *Macomber*, 241 Kan. at 158)—there is no evidence that the witnesses' assertions that they had not suffered adverse symptoms as a result of Zoloft were false. In addition, the denial of the defense request did not prevent defendant from exploring an area. The possibility of adverse effects from Zoloft was fully explored by the defense (see *Frye*, 255 Kan. at 578-79). Therefore, the trial judge acted within his discretion in denying the defense's request to introduce rebuttal testimony.

### Failure to Require a Competency Hearing

A person is incompetent to stand trial when he or she is charged with a crime and because of mental illness or defect is unable to understand the nature and purpose of the proceedings against him or her or to make or assist in making his or her defense. K.S.A. 22-

3301. If, upon the request of either party or upon the judge's own knowledge and observation, the judge before whom the case is pending finds that there is reason to believe that the defendant is incompetent to stand trial, the proceedings shall be suspended and a hearing conducted to determine the competency of the defendant. K.S.A. 22-3302(a). The presumption is that defendant is competent to stand trial. See *State v. Hedges*, 269 Kan. 895, 912, 8 P.3d 1259 (2000).

Prior to trial, the defense filed notice of its intent to raise the defense of lack of mental state. The notice stated:

"COMES NOW THE Defendant, by and through [his attorney], Appointed Defense Counsel, and hereby gives notice pursuant to K.S.A. 22-3219 of the defendant's intention to assert the defense that the defendant, as a result of mental disease or defect, lacked the mental state required as an element of the offense charged. The Defendant also gives notice that the Defense intends to raise related issues including but not limited to involuntary intoxication, *competency to stand trial*, diminished capacity, consent to search, voluntariness of confessions, and reliability of confessions." (Emphasis added.)

The State then moved for a psychiatric evaluation of Groschang. The State's motion requested the court to order the defendant into the custody of Larned State Security Hospital for an evaluation pursuant to K.S.A. 22-3302 (competency to stand trial) and K.S.A. 22-3303. The defense did not oppose the motion.

The psychiatric evaluation report from Larned specifically addressed defendant's competency to stand trial:

"Mr. Groschang is well aware of his current legal predicament and he verbalizes well [an] understanding [of] the seriousness of the present charges that are brought against him. He has communicated an understanding of the role and function of the various officials of the court, how a court trial is conducted and his role as a defendant in a court of law. He has indicated understanding the consequences of being found guilty of the present charges. Currently, he is motivated to assist his attorney in his defense and additionally, he possesses the [e]ffective stability and the capability required to assist his attorney in the preparation and presentation of a legal defense and would be able to manage his own behavior appropriately during a trial. Therefore, it is the opinion of the staff that Mr. Groschang currently meets the criteria to be considered competent to stand trial.

"The court order indicates to consider 'the effects, if any, on the defendant's competency and his ability to assist in his defense including, but not limited to,

his ability to testify in his own defense should the defendant choose to do so.' In this regard, Mr. Groschang is not taking any medication at this time and therefore the issue of the effects of any medication in relation to his competency is not an issue; also, he is capable of testifying in his own defense if he so chooses."

Groschang asserts the report of Dr. Shlensky was sufficient to require the trial court to find him incompetent. The report also states, in part: "[Groschang] *is* and was at the time of the incident suffering from . . . Schizoaffective disorder . . . an organic brain syndrome . . . [and] Sertraline (Zoloft) intoxication." (Emphasis added.)

We note that although Dr. Shlensky reported the presence of these mental disorders and syndromes, the doctor did not conclude that Groschang was incompetent to stand trial. The Larned report had concluded that Groschang was competent. The defense never requested a hearing to challenge that finding. Therefore, the trial court did not err by not holding a competency hearing.

## Admitting Defendant's Statements

Prior to trial, Groschang moved to suppress his statement to police after his arrest. Detective Greg Lawson of the Kansas City, Kansas, Police Department testified at the suppression hearing. Based on an arrest warrant, Lawson arrested Groschang at his residence in Kansas City, Missouri. Groschang was taken to the Kansas City, Missouri, Police Department for questioning. Before interviewing Groschang, the detectives presented Groschang an advice of rights form. After satisfying themselves that Groschang could read the form and was not impaired, the detectives requested Groschang sign the form acknowledging that he had read it and understood his rights. Groschang signed the acknowledgment.

Groschang, who agreed to talk to the police, was articulate and responsive to questions. Groschang stated that he had gone to Perkins the night that Bellaart was murdered and did not know anything about the crime. The officers advised him that information from other witnesses had implicated him in the crime. At that time, Groschang invoked his *Miranda* rights. Questioning immediately stopped.

Detective Mast, who with Lawson conducted the interview, then advised Groschang that they had sufficient information from other sources to charge him with the crime. Therefore, it was not nec-

essary for him to give a statement. This irritated Groschang. Groschang again expressed a desire to speak with an attorney. As the officers got up to leave the room, Groschang said, "What do you guys want to know?"

Lawson informed Groschang, "We can't talk to you anymore, you know, you've invoked your right to an attorney. We can't ask any more questions, this interview's over, you know, by your request." Groschang said, "Well, I don't have a problem, you know, I just don't like this guy" (indicating Detective Mast). To clarify Groschang's wishes, Lawson said, "Okay. Are you re-initiating this interview? That's the bottom line because I cannot go on with this interview unless, you know, I mean you're the one who re-initiated it." Groschang stated that he wanted to talk.

After Mast left the room, Lawson began reviewing with Groschang the evidence collected up to that point, which included witness statements and a weapon found in Groschang's room. Lawson told Groschang that the weapon was crucial evidence, and he was going to have to account for the weapon if he was going to give a truthful statement.

Groschang gave an "informal off-tape interview" before the officers turned on the videotape for a "formal interview." During the formal interview, Groschang was asked if he understood his rights. Groschang replied, "I don't understand anything anymore." Lawson then asked Groschang, "Specifically about these rights, let's go back to square one. Did we read them to you?" Groschang answered, "Yes." Groschang was then asked, "Are you going to give us a statement today on your own free will?" Groschang replied, "May as well."

The trial court reviewed psychiatric reports and considered the testimony of Detective Lawson then ruled:

"Let me just cut to the chase here. Let the record reflect that yesterday — at the conclusion of the hearing yesterday both parties provided me with a statement of individual psychiatrists and the parties stipulated the court could consider those without any sort of testimony or cross examination. I have read both of those reports, I've heard the testimony of Detective Lawson here today.

"And basically on the matters that are put forth here, I find that the statement that was given to Detective Lawson as he testified here this morning is admissible in this trial as being freely and voluntarily given, that he had been properly advised

of his Miranda rights and that the circumstances [that] Detective Lawson testified to would indicate that the defendant understood his rights, he understood he did not have to take — make a statement. That, in fact, he did invoke his rights at one point and then after that point indicated that he did desire to speak, and apparently that's when the formal statement was taken.

"Reading Dr. Shlensky's report, it would indicate that perhaps — I'm interpreting what's in this report — is that — that perhaps this time Mr. Groschang's mental state was such that his judgment may have been impaired, but not to the point of where he did not understand what was going on and he may have made a bad judgment as to giving a statement or not. But there's nothing that I see here that would indicate that this statement should be suppressed in any fashion."

To determine whether a defendant's confession is voluntary, a court looks at the totality of the circumstances. The prosecution bears the burden of proving that a confession is admissible by a preponderance of the evidence. Factors include the duration and manner of the interrogation; the ability of the accused on request to communicate with the outside world; the accused's age, intellect, and background; and the fairness of the officers in conducting the interrogation. The essential inquiry is whether the statement was the product of the free and independent will of the accused. *State v. Minor*, 268 Kan. 292, 297-98, 997 P.2d 648 (2000).

When an accused has invoked his or her right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he or she responded to further police-initiated custodial interrogation, even if he or she had been advised of his or her rights. An accused who has expressed a desire to remain silent is not subject to further interrogation by law enforcement authorities until counsel has been made available to the accused, unless the accused initiates further communication, exchanges, or conversations with the authorities. *State v. Matson*, 260 Kan. 366, 373, 921 P.2d 790 (1996) (citing *Edwards v. Arizona*, 451 U.S. 477, 68 L. Ed.2d 378, 101 S. Ct. 1880 [1981]).

An accused may waive *Miranda* rights by his or her own acts and words in initiating conversation with police. See *State v. Strayer*, 242 Kan. 618, 625, 750 P.2d 390 (1988). In determining whether events subsequent to the exercise of a constitutional right to counsel constitute a waiver of the previously asserted right, the court must first determine whether the accused actually invoked

the right and, if so, the court must then determine whether the accused (a) initiated further discussions with the police and (b) knowingly and intelligently waived the previously asserted right. *Smith v. Illinois*, 469 U.S. 91, 95, 83 L. Ed. 2d 488, 105 S. Ct. 490 (1984). Waiver of the right must be knowing, voluntary, and intelligent under the totality of the circumstances. See *Oregon v. Bradshaw*, 462 U.S. 1039, 1046, 77 L. Ed. 2d 405, 103 S. Ct. 2830 (1983); *Matson*, 260 Kan. at 374.

In *Strayer*, after the defendant was arrested and read his *Miranda* rights, he stated he understood his rights and would not discuss the specifics of the case with police. After making that statement to the officers, the defendant then began questioning the officers regarding his apprehension and, during a lengthy conversation, made incriminating statements. The *Strayer* court held that the defendant waived his *Miranda* rights by his "own acts, words, and surrounding circumstances." 242 Kan. at 625.

Groschang contends that there is not substantial competent evidence to support the trial court's finding that he understood his rights. For support he relies on *State v. Gagnon*, 139 N.H. 175, 651 A.2d 5 (1994).

In *Gagnon*, when police officers took Gagnon into custody, he appeared intoxicated and had difficulty walking. He was taken into an office, still in handcuffs, to be questioned. During an hour-long interrogation, Gagnon continued to exhibit signs of intoxication, even appearing to fall asleep at times. Before interrogating Gagnon, the officer read him his *Miranda* rights. The officer then asked Gagnon whether he understood those rights. Gagnon responded, " 'I don't understand anything[;] I don't know why I'm here[;] I didn't do anything[;] I wasn't driving[;] I was asleep in the back seat . . . .' " 139 N.H. at 176. The officer repeated the *Miranda* warnings. Gagnon again said he did not understand. The officer then asked what specifically the defendant did not understand. Gagnon replied that he did not understand anything. The officer proceeded to interrogate Gagnon, although Gagnon never made a physical gesture or verbal statement indicating that he understood his rights.

Statements made by Gagnon during the course of the interrogation were admitted at trial. These statements were sometimes contradictory and contrary to the physical evidence and tended to undermine the defense strategy.

The trial court specifically found that Gagnon's statements were in response to interrogation and were " 'clearly not spontaneous comments.' " 139 N.H. at 177. Therefore, the law concerning custodial interrogation applied to the statements. Gagnon was convicted of driving after habitual offender certification, driving while under the influence, subsequent offense, disobeying an officer, and reckless driving. Gagnon appealed, contending that the trial court should have suppressed the statements because they were obtained in violation of his State and federal constitutional rights.

The *Gagnon* court cited case law recognizing that a defendant's valid waiver of a right need not be explicit, but absent an explicit waiver, courts must look to the totality of the circumstances to determine whether the record supports the trial court's ruling that the defendant waived his or her *Miranda* rights knowingly, intelligently, and voluntarily beyond a reasonable doubt. 139 N.H. at 177. The court observed that a defendant's " 'mental and physical conditions are crucial in determining whether a knowing, intelligent, and voluntary waiver has occurred.' " 139 N.H. at 178.

After noting that one of the interrogating officers testified at trial that at the time the defendant was interrogated the defendant was " 'obviously intoxicated,' " the *Gagnon* court stated that while intoxication does not preclude the possibility of a valid waiver, it is a factor in determining whether a waiver has been made knowingly, intelligently, and voluntarily. 139 N.H. at 178. The *Gagnon* court then observed that even if the defendant had not been highly intoxicated, the manifest weight of the evidence indicated that his alleged waiver of rights was not valid. The officer's testimony was that, when asked whether he understood his rights, the defendant repeatedly said, " 'I don't understand.' " 139 N.H. at 176-77. The officer's only basis for believing the defendant understood his rights and thus was capable of knowingly, intelligently, and voluntarily waiving those rights was best illustrated by this exchange

between defense counsel and the officer at the suppression hearing:

" '[Attorney]: Sergeant Ruel, you're saying that the fact that a person says "I don't understand" in an argumentative tone of voice indicates that they do, in fact, understand and that's the basis for your believing that he understood?

" '[Officer]: That is my belief, yes.

" '[Attorney]: But, in fact, you did testify that he did not ever indicate to you, either verbally or physically by physical gesture, that he understood?

" '[Officer]: That is correct.' " 139 N.H. at 178.

Given the admission by the State's own witness that Gagnon never gave any indication, verbal or otherwise, that he understood his rights or chose to waive them, the *Gagnon* court held that the totality of the circumstances, even when viewed in the light most favorable to the State, did not support the trial court's finding that the defendant validly waived those rights and reversed the defendant's convictions. 139 N.H. at 178.

Here, the State points out that although Groschang in the taped interview indicated that he did not understand "anything anymore," he indicated by signing the acknowledgment of rights and by his subsequent conduct that he understood his rights. Because the statement by Groschang that he did not understand was subsequent to the signing of the *Miranda* form, we look to Groschang's conduct as an indication of his understanding.

The scenario that occurred during the interview clearly demonstrated that Groschang understood his rights and knew how to invoke them. When he invoked his rights, the questioning ceased, and when he withdrew that invocation, the officers asked him to clarify his intentions, which he did, and the questioning resumed. Groschang's statement that he "didn't understand anything anymore" was not a specific indication that he did not understand his rights.

*Gagnon* is factually distinguishable. In *Gagnon*, the defendant neither, by statement or conduct, indicated that he understood his rights. Here, Groschang signed the acknowledgment of understanding and stated that he understood his rights, then waived his rights to remain silent and have an attorney present during ques-

tioning. Groschang knowingly, voluntarily, and intelligently waived his right to remain silent.

## Lesser Included Offenses

A criminal defendant has a right to an instruction on all lesser included offenses supported by the evidence at trial so long as (1) the evidence, when viewed in the light most favorable to the defendant's theory, would justify a jury verdict in accord with the defendant's theory; and (2) the evidence at trial does not exclude a theory of guilt on the lesser offense. *State v. Moncla*, 262 Kan. 58, 73-74, 936 P.2d 727 (1997). An instruction on an included offense is not proper if from the evidence the jury could not reasonably convict the defendant of the lesser offense. *State v. Robinson*, 261 Kan. 865, Syl. ¶ 7, 934 P.2d 38 (1997).

The State and defense requested an instruction on second-degree murder. The trial court denied the requests, stating:

"Well, I don't believe that second-degree is an appropriate instruction here. All the evidence of what took place in this particular matter would have been a premeditated first degree murder. And the only thing that would excuse that would be if the defendant's state of mind was legally such that he could not form the specific intent to premeditatedly kill someone or the specific intent to kill someone. And that intent to kill is an element of the crime of first-degree murder. And I don't see how a jury could find the defendant not guilty of first degree murder, but find him guilty of second degree murder under the defenses that have been presented here."

Groschang asserts that the trial court erred in failing to instruct on second-degree murder because there was evidence presented at trial that would support a second-degree murder conviction. The evidence Groschang refers to was offered by Thompson. Thompson's testimony indicates that when she and Groschang left the house for the fairgrounds, she had no intention of killing Bellaart. The defendant also points to the testimony and report of Dr. Shlensky which indicated that Groschang was suffering from the adverse effects of Zoloft.

First, we note that Thompson's testimony did not suggest that Groschang's killing of Bellaart was not premeditated. Her testimony minimized her role in the killing by suggesting that she had no direct knowledge of Groschang's plan to kill Bellaart and that

she was surprised by the murder. In addition, the mental defect defense supported by the testimony and report of Dr. Shlensky did not provide evidence to support a second-degree murder conviction.

Dr. Shlensky's testimony and report dealt with Groschang's ability to form criminal intent. Groschang admitted to planning to kill Bellaart and then following through with his plan by shooting five bullets into her head while she slept. If the jury believed that Groschang was incapable of forming criminal intent because of mental defect or because of voluntary or involuntary intoxication, it would have found Groschang not guilty. Since the jury did not believe Groschang's defense, the jury concluded that he was guilty of premeditated murder. The evidence at trial did not require the trial judge to give a lesser instruction of first degree premeditated murder.

### Admitting a Gruesome Videotape

The trial court has broad discretion regarding the admission of relevant demonstrative photographs. To determine whether such photographs should be admitted, a trial court must decide whether they are relevant and a proper foundation has been laid. *State v. Roberts*, 261 Kan. 320, 329, 931 P.2d 683 (1997).

Groschang contends that the trial court erred in admitting a video of the crime scene into evidence. The video depicted, among other things, the body of Bellaart with five bullet wounds to her head. At trial, Groschang objected to the admission of the tape. The district court overruled the defense objection, stating that the videotape was relevant to depict what occurred and how the scene looked at the time.

Except as otherwise provided by statute, all relevant evidence is admissible. K.S.A. 60-407(f). Even if the defendant concedes the cause of death, the prosecution has the burden to prove all the elements of the crime charged; photographs to prove the elements of the crime, including the fact and manner of death and the violent nature of the crime, are relevant and admissible. Photographs depicting the extent, nature, and number of wounds inflicted are generally relevant in a first-degree murder case. Photographs are

unduly prejudicial and are erroneously admitted when they are unduly repetitious, are particularly gruesome, and add nothing to the State's case. *State v. Hickles*, 261 Kan. 74, 85, 929 P.2d 141 (1996).

We have viewed the videotape; it showed the victim's head, blood splatters, and brain matter. The evidence that Groschang committed the crime was uncontested and overwhelming. The jury did not accept Groschang's mental defect defenses. The gruesome videotape was properly admitted.

### First-Degree Premeditated Murder Statute and Jury Instruction

The constitutionality of a statute is presumed, all doubts must be resolved in favor of its validity, and before the statute may be stricken down, it must clearly appear the statute violates the Constitution. In determining constitutionality, it is the court's duty to uphold a statute under attack rather than defeat it, and if there is any reasonable way to construe the statute as constitutionally valid, that should be done. Statutes are not stricken down unless the infringement of the superior law is clear beyond substantial doubt. *State ex rel. Tomasic v. Unified Gov. of Wyandotte Co./Kansas City*, 264 Kan. 293, 300, 955 P.2d 1136 (1998).

Groschang argues that K.S.A. 21-3401(a), premeditated murder, in conjunction with the instruction given in this case on the definition of "premeditation" effectively blurred the distinction between first-degree premeditated murder and second-degree intentional murder, making the statute constitutionally vague. We disagree.

Instruction No. 7 stated the statutory elements of premeditated murder and included the following definition of "premeditation": "Premeditation means to have thought over the matter beforehand for any length of time sufficient to form an intent to act."

First, it should be noted that the trial court's instruction No. 7 adds to the PIK Crim. 3d instruction defining premeditation. PIK Crim. 3d 56.04 provides that "premeditation means to have thought over the matter beforehand." The PIK instruction does not address in any manner the time required to form intent.

In *State v. Moncla*, 262 Kan. 58, this court examined the following modification to the PIK definition of "premeditation": " 'Premeditation means to have thought over the matter beforehand. There is no particular time period for premeditation and it may arise in an instant.' " 262 Kan. at 70. Based upon the facts, we approved the phrase "there is no particular time period for premeditation" as a correct statement of Kansas law. However, we disapproved the phrase "[premeditation] may arise in an instant." 262 Kan. at 72.

In *State v. Saleem*, 267 Kan. 100, 977 P.2d 921 (1999), the defendant challenged the sufficiency of evidence of premeditation. The defendant noted our definition of premeditation in *State v. Thompkins*, 263 Kan. 602, 952 P.2d 1332 (1998), where this court used the definition of premeditation found in *State v. McGaffin*, 36 Kan. 315, 319, 13 Pac. 560 (1887): Premeditation "means that there was a design or intent before the act; that is, that the accused planned, contrived, and schemed" before killing the victim. The *Saleem* court stated that the *Thompkins'* definition was based on homicide definitions in earlier statutes and that the current PIK instruction ("premeditation means to have thought over the matter beforehand") is not from the 1887 *McGaffin* case. The *Saleem* court rejected the defendant's use of an earlier definition of premeditation to argue that the evidence was insufficient to find premeditation. Justice Allegrucci concurred with the majority opinion, but disagreed with the majority's approval of the definition of "premeditation" as "to have thought over the matter beforehand." 267 Kan. at 115. J. Allegrucci stated:

"As noted in the majority opinion, this court has used words such as 'plan,' 'contrive,' and 'schemed beforehand' to define premeditation. This court has required that a defendant not only think it over beforehand, but also to come to the conclusion that he or she would kill the victim and then do so. The majority, by approving PIK Crim.3d 56.04(b), has, in my opinion, essentially repealed K.S.A. 21-3402(a)."

Groschang adopts Justice Allegrucci's statement and argues that the premeditated murder statute together with the instruction approved by this court blurs the distinction between premeditated murder and second-degree intentional murder to the point where

there can never be an intentional killing that is not a premeditated killing.

Did the statement in Instruction No. 7 that "[p]remeditation means to have thought over the matter beforehand for any length of time sufficient to form an intent to act" make K.S.A. 21-3401(a) constitutionally vague under the facts herein? No. Groschang told Thompson it was necessary to kill Bellaart. Groschang then left the house armed with a weapon intending to kill Bellaart. It took the defendant at least 45 minutes to drive to the fairgrounds. He climbed over a fence, opened the car door and fired five shots into the head of the sleeping victim. The jury found Groschang had the necessary mental capacity to form criminal intent to kill the victim. There is no evidence of second-degree intentional murder. The only evidence is that Groschang committed premeditated murder.

### *Miranda* Warnings Prior to Mental Examination

K.S.A. 22-3302(3) provides that no statement made by the defendant in the course of any examination to determine competency, whether or not the defendant consents to the examination, shall be admitted in evidence against the defendant in any criminal proceeding.

Groschang contends that the trial court erred in allowing into evidence statements made by him during the court-ordered evaluation to determine competency to stand trial and mental state at the time of crime. He does not take issue with evidence related to his mental state at the time of the crime, since he put his mental state at issue. He, therefore, waived any objection to evidence relevant to this point. In addition, Groschang did not object to the evidence of competency during the trial. He argues that this court must address the issue because it involves the prohibition against self-incrimination, a fundamental constitutional right.

Where constitutional grounds are asserted for the first time on appeal, they are not properly before the appellate court for review. *State v. Mason*, 268 Kan. 37, 39, 986 P.2d 387 (1999). We have recognized three exceptions to the general rule when:

"(1) the newly asserted theory involves only a question of law arising on proved or admitted facts and which is finally determinative of the case; (2) questions are

raised for the first time on appeal if consideration of the same is necessary to serve the ends of justice or to prevent denial of fundamental rights; and (3) the judgment of a trial court may be upheld on appeal although that court may have relied on the wrong ground or assigned a wrong reason for its decision. [Citations omitted.]" *State v. Mincey*, 265 Kan. 257, 267, 963 P.2d 403 (1998).

When reviewing a constitutional challenge to the admission of evidence, the appellate court applies the federal constitutional rule. Under that rule, an error may not be held to be harmless unless the appellate court is willing to declare beyond a reasonable doubt that the error had little, if any, likelihood of having changed the result of the trial. *State v. Lyons*, 266 Kan 591, 598, 973 P.2d 794 (1999).

Because Groschang was committed to Larned State Security Hospital for evaluation regarding his competence to stand trial and his mental state at the time of the crime, it is difficult to separate the testimony relating to one aspect of the mental examination or the other. Groschang complains of the following testimony:

"[Mr. Groschang had] moderate tendency toward self-abasement and a desire to self-disclose psychopathology possibly for the purpose of a secondary gain or because of the presence of acute emotional distress. During all contacts with the patient, it was obvious he was an intense, thorough, meticulous, focused individual who was aware of the seriousness of his current legal dilemma and the options available to the court as far as possible disposition of his case. On several occasions, he made it known to this examiner that he would consider the possibility of suicide if convicted as charged and sentenced to prison."

Groschang then cites the testimony of Dr. Fernando regarding his IQ score of 115. Groschang complains about the doctor's testimony that he diagnosed Groschang with dysthymic disorder, early onset; alcohol dependence; and personality disorder, not otherwise specified, with dependent and self-defeating traits, and the doctor's conclusion that the psychological screening for neuropsychological types of impairment revealed no indication of significant dysfunction."

Because K.S.A. 22-3302(3) specifically prohibits introducing at trial incriminating statements made by the defendant in the course of a competency examination, no *Miranda* warning is required. With one exception, the complained-of testimony relates to obser-

vations and conclusions of evaluators and test results. The exception noted is Dr. Fernando's testimony that "[o]n several occasions, [Groschang] made it known to this examiner that he would consider the possibility of suicide if convicted as charged and sentenced to prison." The defendant has failed to show that any statement he made during the competency evaluation was introduced as evidence of guilt.

### Failing to Read Back Testimony

K.S.A. 22-3420(3) places a mandatory duty upon the trial court to respond to the jury's request for further information as to any part of the law or evidence arising in the case, but the manner and extent of the trial court's response rests in the sound discretion of the court. *State v. Boyd*, 257 Kan. 82, Syl. ¶ 1, 891 P.2d 358 (1995).

The P.D.R. was not admitted into evidence. Dr. Shlensky referred to the P.D.R. and read portions of the Zoloft article in the P.D.R. during cross-examination. During jury deliberations, the jury requested to examine the P.D.R. In response to the jury's request, the trial judge, after conferring with the prosecutor and the defense, sent back two sections of the P.D.R. that had been testified to and read during trial. Defense counsel agreed that the sections should be sent to the jury and requested that the sections be enlarged so they would be easier to read by the jury.

Groschang now complains that a relevant portion of the article, a sentence stating that .4 percent of people have mania as a result of taking Zoloft, was not included in the material sent to the jury. The sentence was read to the jury during Dr. Shlensky's testimony.

The record clearly shows that Groschang participated in the proceedings and was given the opportunity on the record to voice any objections or to suggest a different response. He did not do so. The time-honored rule that an issue not presented to the trial court may not be raised for the first time on appeal, *State v. Ji*, 251 Kan. 3, 17, 832 P.2d 1176 (1992), also applies to jury requests under K.S.A. 22-3420(3). As the State points out, a timely objection is necessary to give the trial court the opportunity to correct any alleged trial errors. See *State v. Wolfe*, 194 Kan. 697, 699, 401 P.2d 917 (1965).

Clearly, the defendant had the opportunity to object and to inform the trial court of his dissatisfaction with the court's response to the jury request while the court still had a chance to correct any error. By failing to object, the defendant waived his right to raise the issue on appeal.

Affirmed.