(205 P.3d 779)
No. 97,976

STATE OF KANSAS, *Appellee*, v. BRIAN JONES, *Appellant*.

Opinion filed April 17, 2009.

*Carl Folsom, III*, of Kansas Appellate Defender Office, for appellant.

*Steven J. Obermeier*, assistant district attorney, *Phill Kline*, district attorney, and *Stephen N. Six*, attorney general, for appellee.

Before MCANANY, P.J., BUSER and STANDRIDGE, JJ.

BUSER, J.: Brian Jones appeals his conviction and sentence for aggravated robbery. We reverse the conviction, vacate the sentence, and remand for a new trial because, during the jury's deliberations, the trial court erroneously responded to the jury's question about fingerprint evidence in violation of K.S.A. 22-3420(3), and this error resulted in prejudice to Jones.

### Factual and Procedural Background

This case arose from two different carjackings that occurred within 1 day of each other—one in Missouri and the other in Kansas.

The first carjacking occurred on the evening of February 21, 2005, in Kansas City, Missouri. Erin Adcock left her veterinarian's office and entered the driver's side of her Dodge Stratus. Without warning, a man armed with a handgun approached the car and told Adcock, " 'You can get out of the car, or I could shoot you.' " When Adcock tried to lock the car door, the man threatened, " 'You better not or I will kill you.' " The man opened the door and told Adcock to get out. As he pointed the weapon at Adcock, he repeatedly warned her not to look at him or she would be shot. The man then drove off in Adcock's Stratus. Adcock, who was unable to get a good look at the assailant, described him as a slender, 5-foot 9-inch, black male, with a slender jaw line and smooth skin.

The next day, Eric Clark returned to work about 2 p.m. and parked his Honda Accord in the parking lot of the Lighton Tower office building in Overland Park. As Clark started to get out of his vehicle, a man quickly walked up behind him, displayed a handgun, and demanded Clark's wallet and keys. The assailant said something which Clark understood to mean that the man was on drugs and was not afraid to use the gun. Clark gave the man his keys, wallet, and cell phone before walking away. The assailant drove off in Clark's vehicle. Clark was only able to give a general description of the man, whom he had not looked in the eye.

David Warner, who worked on the fifth floor of Lighton Tower, witnessed the carjacking of Clark's Accord from his office window. Warner informed the police that prior to the carjacking, he saw the assailant standing beside a Dodge Stratus, which was later identified as Adcock's vehicle that had been stolen the prior evening.

The following afternoon, Officer Frank Reaves, of the Kansas City, Missouri, Police Department, saw an Accord, later identified as Clark's stolen vehicle, enter the parking lot of an apartment complex in Kansas City, Missouri. Officer Reaves saw two black men get out of the vehicle and walk toward the apartments. When Officer Reaves told the men to stop, they ran away. Officer Reaves apprehended the driver of the vehicle, Ronderrick Briggs. The other man escaped. Briggs had keys to Adcock's Stratus in his hand when Officer Reaves detained him. Briggs was also carrying the insurance and registration papers for Clark's Accord. During a subsequent search of the Accord, a silver-colored B.B. gun was found in the passenger compartment.

Two days later, Jones was interviewed by Overland Park Detective Jeff Cohee at the Kansas City, Missouri, Police Department. Prior to the interview, Jones was orally advised of his rights under *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, *reh. denied* 385 U.S. 890 (1966). Jones also signed a written *Miranda* rights waiver.

Jones initially denied involvement in the aggravated robbery of Clark. Later, during the interview, he confessed. He subsequently agreed to provide Detective Cohee with a videotaped statement

detailing his involvement in the aggravated robbery. A digital copy of the interview was shown at trial to the jury.

Jones admitted to police that Briggs had driven him in the Stratus to a parking lot near where his fiancée worked. Jones ingested some cocaine. At Brigg's urging, Jones then confronted a white man and told him, "I'm sorry man but right now I got problems. I got a drug problem and I don't want to hurt you." After the aggravated robbery, Jones picked up Briggs and drove off in the Accord. Under questioning, Jones provided details about the carjacking, including how he had used the victim's cell phone to make a phone call about selling the radio that had been removed from the Stratus. Jones also identified a photograph of the B.B. gun he used in the robbery.

Adcock's Stratus and Clark's Accord were processed for fingerprints and DNA. The latent evidence was then compared to known fingerprints and DNA of Briggs and Jones. Briggs' fingerprints and/or DNA were found in the Accord on the steering wheel, turn signal, gear shift, and a beer can. Briggs' fingerprints were also found in the Stratus, and his DNA was found on the steering wheel and on a marijuana joint found in the vehicle.

Jones' DNA was found on the steering wheel of the Stratus and on the marijuana joint. No latent fingerprints or DNA recovered from the Accord were positively identified to Jones.

The State charged Jones with the aggravated robbery of Clark.

About 4 months later, Jones wrote a letter to Detective Cohee. Jones stated in the letter that at the time of his confession, he had withheld information out of fear for his family's safety. Jones said his family had since moved away and requested Detective Cohee come speak with him at the jail so Jones could tell him the truth about the case. The detective never contacted Jones.

At trial, Jones testified in his own defense, recanted his confession, and denied committing the aggravated robberies of Adcock or Clark. Jones also implicated Briggs and a person he knew only as Prince D in the robberies.

With regard to his confession, Jones explained he only confessed to the crime because the detectives were pushing him and "wouldn't stop it until they got something . . . out of [him]."

Jones insisted he figured out certain details about the aggravated robbery that he provided to Detective Cohee based on the detective's accusations during the interrogation. Jones also suggested he confessed because he was led to believe he would receive only a brief time in drug rehabilitation by admitting to the aggravated robbery of Clark.

Jones provided the jury with a detailed explanation regarding why his DNA was found in Adcock's Stratus. According to Jones, on the morning of February 22, 2005 (the day after the aggravated robbery of Adcock), he was walking in Overland Park when he saw a Stratus driven by an unknown man with Briggs in the passenger seat. Briggs introduced the man to Jones as Prince D. The men agreed to drive Jones to his fiancée Lakisha Lindsey's workplace, which was located near the Lighton Tower office building. Jones sat in the back seat of the Stratus and shared two marijuana joints with Briggs and the driver.

When the men arrived at Lindsey's workplace in the early afternoon, Jones borrowed her truck, and Briggs and Prince D left. Jones then went home, got dressed, and ran some errands. According to Jones, he and Lindsey spent the next day together, running errands and watching movies.

Jones testified that the following day, February 24, 2005, he encountered Prince D and two other men, one of whom Jones knew only as Coco. Prince D accused Jones of talking to the police. When Jones insisted he had not done so, Coco pushed Jones up against a wall, and Prince D put a gun to Jones' head. Jones was taken into a nearby wooded area where Prince D threatened Jones and said that he would kill Jones or hurt Lindsey and her sister if Jones talked to the police. The men then took Jones' money, watch, and chain and told Jones to run. As Jones ran into the woods, he heard the men laughing and several gunshots.

Jones also testified that Prince D had told him some details of the crimes which he later told the police. Because he was concerned about Lindsey's and her sister's safety, however, he did not mention Prince D's name to the police. Jones further explained that he wrote the letter to Detective Cohee after Lindsey and Lakeeta had moved, so Jones knew they were safe.

Lindsey testified for the defense, and her account mirrored Jones' version of the events. Lindsey also testified that when she was later approached by Briggs' sister, she felt her life was in danger, so she moved away.

At the conclusion of the trial, the jury found Jones guilty of the aggravated robbery of Clark. Jones was sentenced to a standard presumptive sentence of 233 months in prison. He filed a timely appeal.

On appeal, Jones contends the trial court committed reversible error when it misstated the evidence in answer to this question posed by the jury during deliberations: "Were there identified fingerprints on the gun?" Jones argues that the trial court's response that "no evidence was presented about fingerprints on the gun" was erroneous and violated K.S.A. 22-3420(3).

*Preservation of the Issue for Appellate Review*

Before reaching the merits of Jones' contention, we must first consider the State's argument that this issue was not preserved for appellate review. In particular, the State contends that Jones' failure to contemporaneously object to the trial court's response constitutes a waiver of his right to appeal this issue.

In support, the State cites *State v. Groschang*, 272 Kan. 652, 36 P.3d 231 (2001). In *Groschang*, our Supreme Court held the "time-honored" rule that an issue not presented to the trial court may not be raised for the first time on appeal also applies to jury requests under K.S.A. 22-3420(3). 272 Kan. at 672. The court reasoned that a timely objection is necessary to give the trial court the opportunity to correct any alleged trial errors. The record in *Groschang* reflected that, although the defendant had an opportunity, he did not object or suggest an alternative response to the jury's request. As a result, our Supreme Court held the defendant waived his right to appeal this issue. 272 Kan. at 673.

Jones admits there was no contemporaneous objection to the trial court's response to the jury's question. Jones notes, however, the record does not reflect the trial court sought or received input from the parties at the time the question was received from the jury or at any time prior to the trial court's response. Moreover,

the record does not show that Jones and his counsel were present in the courtroom when the trial court answered the jury's question.

Relying on *State v. Myers*, 255 Kan. 3, 872 P.2d 236 (1994), Jones argues that under these circumstances he should not be held to have waived the right to appeal this issue. In *Myers*, the record did not disclose the presence of the defendant or his counsel when the trial court received questions from the jury and when the trial court responded to those questions. Nor did the record disclose any discussion between the trial court and counsel regarding the merits of the questions or the trial court's responses. Our Supreme Court refused to infer the defendant's presence and opportunity to respond from a silent record. Accordingly, the Supreme Court concluded the defendant did not waive his right to challenge the trial court's responses to the jury's inquiries. 255 Kan. at 9.

The crucial distinction between the holdings in *Myers* and *Groschang* lies in whether the record indicates that the defendant had an opportunity to voice any objections or to suggest a different response to a jury's question but remained silent or otherwise acquiesced in the trial court's course of action. Where the record affirmatively reveals the defendant's presence and an opportunity to participate in the formulation of the trial court's response to a jury's question during deliberations (as in *Groschang*), our Supreme Court has found that a defendant's failure to contemporaneously object constitutes a waiver to raise the issue on appeal. On the other hand, where the record is silent concerning the defendant's presence or opportunity to participate (as in *Myers*), waiver may not be presumed.

Nothing in the record indicates that Jones or his counsel were present at the time the jury's question was provided to the trial court. There is no indication from the record that Jones or his counsel participated in any colloquy with the trial court regarding an appropriate response to the jury's question. Finally, the record does not disclose that Jones or his counsel were present at the time the trial court advised the jury of its response. Given this record, *Myers'* holding controls, and we will not presume that Jones waived his right to raise this issue on appeal.

*Trial Court's Response to Jury's Question During Deliberations*

Turning to the merits, we note this is a novel legal issue. Our case law has frequently addressed situations wherein a trial court has responded to a question of law posed by the jury during deliberations. See, *e.g.*, *State v. Murdock*, 286 Kan. 661, 681-83, 187 P.3d 1267 (2008) (jury requested clarification as to the difference between aggravated battery with a deadly weapon and aggravated battery in a manner whereby great bodily harm, disfigurement, or death can be inflicted.); *State v. Dunnan*, 223 Kan. 428, 431-33, 573 P.2d 1068 (1978) (jury requested clarification regarding lesser offenses of second-degree murder and the definition of "maliciously").

On other occasions, our appellate courts have reviewed the trial court's response to the jury's request to review evidence, read transcripts of trial testimony, or have a read-back of trial testimony. See, *e.g.*, *State v. Boyd*, 257 Kan. 82, 84-91, 891 P.2d 358 (1995) (jury requested portions of transcripts of child victim, police officers' trial testimony, and portions of defense attorney's closing argument); *Myers*, 255 Kan. at 4-9 (jury requested copies of police reports and transcripts of trial testimony).

In the present case, however, Jones requests that we review the trial court's response to the jury's specific question about certain evidence presented at trial. In particular, whether identified fingerprints were on the gun believed to have been used in the aggravated robbery of Clark.

K.S.A. 22-3420(3) provides:

"After the jury has retired for deliberation, if they desire to be informed as to any part of the law or evidence arising in the case, they may request the officer to conduct them to the court, where information on the point of the law shall be given, or the evidence shall be read or exhibited to them in the presence of the defendant, unless he voluntarily absents himself, and his counsel and after notice to the prosecuting attorney."

Review of this issue requires interpretation of K.S.A. 22-3420(3). Interpretation of a statute is a question of law over which an appellate court has unlimited review. *State v. Storey*, 286 Kan. 7, 9-10, 179 P.3d 1137 (2008). Additionally, our Supreme Court has set

forth the appropriate standard of review in matters involving K.S.A. 22-3420(3):

"A trial court may not ignore a jury's request submitted pursuant to K.S.A. 22-3420(3) but must respond in some meaningful manner or seek additional clarification or limitation of the request. *It is only when the trial court* makes no attempt to provide a meaningful response to an appropriate request or *gives an erroneous response* that the mandatory requirement of K.S.A. 22-3420(3) is breached. Once the trial court attempts to give an enlightening response to a jury's request or seeks additional clarification or limitation of the request, then any issue as to the sufficiency or propriety of the response is one of abuse of discretion by the trial court." (Emphasis added.) *Boyd*, 257 Kan. 82, Syl. ¶ 2.

This passage from *Boyd* suggests a two-step approach when an appellate court reviews whether a trial court has violated K.S.A. 22-3420(3). First, we conduct a de novo review to determine if the statute has been breached because the trial court failed to respond to the jury's question or because the trial court provided an erroneous response to the question. Second, if the trial court complies with these mandatory statutory requirements, our court will employ an abuse of discretion standard in evaluating the sufficiency or propriety of the response.

The case was submitted to the jury late in the day, and the jury opted to begin its deliberations on the following morning. At that time, the trial judge briefly addressed the jury:

"THE COURT: I'm trying to think. This won't take very long, long enough to sit down.

"At the end of yesterday you sent out a question, 'Were there identified fingerprints on the gun?' Normally I answer questions about evidence in this way: You must rely on the evidence presented, *but I can tell you that no evidence was presented about fingerprints on the gun.*

"At this time, the jury is all present. I will send you back to the jury room to continue your deliberations." (Emphasis added.)

Jones complains that the emphasized portion of the judge's response misstated the evidence because Detective Cohee testified that Briggs' fingerprints—and no others—were found on the gun used in the aggravated robbery of Clark. Specifically, during defense counsel's cross-examination of Detective Cohee, the following colloquy occurred:

"Q. Later on that day you actually had the opportunity to interview Mr. Briggs?

"A. Yes.
"Q. And you talked to him about the robbery of the [Accord]?
"A. Yes.
"Q. He admitted his fingerprints would be on that gun?
"A. Yes.
"Q. And indeed his fingerprints were on it?
"A. I believe so.
"Q. No other fingerprints on it?
"A. No."

The State counters that the trial court's response was not erroneous because Detective Cohee's response, "I believe so," was "equivocal" and "not exactly certain." The State also points out "[t]here was no evidence presented that the crime lab had examined the gun for latent fingerprints."

Having reviewed the record, we conclude the trial court's response that "no evidence was presented about fingerprints on the gun" was erroneous because it was a misstatement of the trial testimony. Detective Cohee clearly testified that he believed Briggs' fingerprints—and no others—were on the handgun used in the aggravated robbery of Clark. Accordingly, we hold the trial court violated the mandatory requirement of K.S.A. 22-3420(3) not to provide the jury with an erroneous response to their question.

Next, we must determine whether " 'the rights of the defendant were in any way prejudiced by the action of the trial court' " in misstating the evidence. *Murdock*, 286 Kan. at 680 (quoting *State v. Wilson*, 169 Kan. 659, 663, 220 P.2d 121 [1950]).

Jones argues:

"The court's response also severely prejudiced Mr. Jones' right to a fair trial. Det. Cohee's testimony that Mr. Briggs' fingerprints were on the gun was clearly exculpatory to Mr. Jones. Mr. Jones' theory was that Mr. Briggs and Prince D committed the robbery, and Det. Cohee's testimony about the gun supported that."

The State rebuts Jones' claim of prejudice by noting that Jones admitted committing the aggravated robbery of Clark and the "jury was well aware of the lack of Jones' fingerprints and DNA in the vehicles. No physical evidence identifiable to Brian Jones could be located from the [Accord]."

Based on our review of the trial record, the critical issue for the jury's determination was the identity of the man who robbed Clark. Both the State and Jones presented substantial conflicting evidence regarding this issue. Clark was unable to identify the robber. Jones confessed to the aggravated robbery and identified a picture of the B.B. gun recovered from Clark's Accord as the weapon he used in the crime. Immediately prior to the recovery of the gun, however, Briggs was seen driving the Accord and, when confronted by the police, he attempted to flee. Although forensic evidence tied Briggs to Clark's Accord, no such evidence linked Jones to this vehicle. Jones later recanted his confession at trial and incriminated Briggs and Prince D in the aggravated robbery. Jones also presented witnesses to corroborate his testimony that Briggs and Prince D, not Jones, committed the crime.

The jury's question: "Were there identified fingerprints on the gun?" was specifically directed at the critical issue in the case, which was highly controverted—the determination of the robber's identity. The correct answer to this question—that Detective Cohee testified that he believed Briggs' fingerprints, and no others, were on the gun—supported Jones' defense that Briggs, not Jones, committed the crime. The response provided by the trial court that "no evidence was presented about fingerprints on the gun" was not just erroneous but adverse to Jones' defense. Under these circumstances, we find Jones was prejudiced and to not reverse his conviction and vacate his sentence would be "inconsistent with substantial justice." K.S.A. 60-261; see *State v. Drayton*, 285 Kan. 689, 709, 175 P.3d 861 (2008).

Finally, we reiterate the guidance recently provided by our Supreme Court:

"Due to the grave risk of misleading the jury and the real risk of reversal, a judge responding to a jury question should avoid extemporaneous discussions with a jury on questions submitted. The better practice is to confer on the record with counsel and the accused before responding to the jury's question. Counsel should be given the opportunity to provide input as to the final answer, preferably by way of written recommendations to the judge. Under such circumstances, the risk of misleading the jury or of committing reversible error in the answer given is greatly reduced, and the potential that the answer will help the jury in its deliberations is greatly increased." *Murdock*, 286 Kan. at 683.

Because our holding on this issue is determinative of the appeal, we decline to address the other issues raised by Jones.

The conviction is reversed, the sentence is vacated, and the case is remanded for a new trial.