(322 P.3d 404)
No. 108,597

STATE OF KANSAS, *Appellee*, v. JAMES CLINTON RAMEY, *Appellant*.

Opinion filed March 28, 2014.

*Samuel Schirer*, of Kansas Appellate Defender Office, for appellant.

*David Maslen*, assistant county attorney, *Larry Markle*, county attorney, and *Derek Schmidt*, attorney general, for appellee.

Before PIERRON, P.J., BUSER, J., and BUKATY, S.J.

PIERRON, J.: James Clinton Ramey appeals his convictions by a jury for aggravated burglary, misdemeanor theft, and vehicle burglary. Before trial, he pled guilty to criminal damage to property, possession of methamphetamine, and possession of drug para-

phernalia involving the same incident. Ramey's main issue on appeal is a plethora of allegations of prosecutorial misconduct. He also argues the trial court erred in its response to a jury question and failed to make the proper analysis for assessing Board of Indigents' Defense Services (BIDS) attorney fees. Additionally, Ramey claims the journal entry states the incorrect amount of attorney fees awarded by the trial court, that he was entitled to a lesser included offense instruction on simple burglary, his prior convictions were not proven to a jury, and cumulative error denied him a fair trial. We find there was cumulative error which requires a reversal and remand for new trial.

## Factual Background

Beverly Zimmerman is over 80 years old. She was asleep in her home on the night in question and awoke to a big crash. When she came out of her bedroom, she saw the silhouette of a man followed by a dog in her house. After turning on the kitchen light, Zimmerman saw Ramey and told him he was in the wrong house. Zimmerman testified Ramey said, "[N]o, I'm cold. The rest of them will be here pretty soon." Zimmerman testified she knew she needed to get out of the house. She tried to call the police on her cordless phone, but it did not work. She walked out onto the porch to see if it would work, but it would not. Zimmerman took the phone back inside, hung it up, and then walked to a neighbor's house to call the police. She said Ramey never threatened her and just repeated that he was cold. Zimmerman had $14 in her wallet that was missing after the incident. She testified she had not left her car door open that night and usually kept her driver's license and bank cards in her purse.

Officer Jason Reddy of the Independence Police Department responded to Zimmerman's home-invasion call. Officer Reddy approached Zimmerman's house, and through the front window he saw Ramey going through the kitchen cabinets. As Officer Reddy opened the front door, it squeaked and through the window he could see Ramey run the opposite direction down a hallway. Officer Reddy chased Ramey and at gunpoint ordered him to show his hands. Ramey immediately complied, and Officer Reddy or-

dered Ramey to get on the floor. Ramey called his dog off. Officer Reddy took Ramey into custody without incident.

During a search incident to the arrest, officers discovered a small bag of methamphetamine in Ramey's wallet. During the search, Ramey also asked for a drug test. Officer Reddy noticed the front door frame was broken and there was a ball cap on the front walkway just before the stairs. Officer Reddy believed Ramey was under the influence of methamphetamine based on his observations of Ramey's racing pulse rate and profuse sweating. Officer Reddy testified that despite the drugs, Ramey knew what was going on and had no problem understanding his *Miranda* rights. Ramey took a drug test at the station, and the results indicated he had methamphetamine, amphetamines, and marijuana in his blood.

Officer Reddy testified that in his investigation, he discovered Ramey had a suspended driver's license. He found it odd that Ramey had a suspended driver's license yet was found in possession of keys to a newer model vehicle. When officers later spoke with Zimmerman, she said she was missing keys. The keys found on Ramey were to the car in her garage.

On cross-examination at trial, defense counsel questioned Officer Reddy on the unusual aspects of the incident as indicators of the lack of intent to commit a burglary, namely the lights were on in the house, Ramey had a dog with him, he had no weapons, he complied with the officer's requests, Ramey left his hat and shirt in the front yard, he asked for a drug test, and Zimmerman was not threatened or harmed in any way when confronted by Ramey.

Officer Jason Simmons testified to his assistance in getting Zimmerman back to her house. He said the charger/base for Zimmerman's cordless phone was not plugged in. When he placed the cord back into the base, the phone had worked properly. Zimmerman told Officer Simmons that her phone worked fine before she went to sleep that night. Officer Simmons said Zimmerman had called the police department and advised dispatch she was missing some money. When Officer Simmons spoke with Zimmerman the next morning, she said she was missing $20 and then later said it was probably $17 or $18.

Officer Jon Schenk followed up with Zimmerman the next morning as to several missing items. When he helped Zimmerman search her house, they found Zimmerman's driver's license, bank cards, pictures, and other cards on the floor and steps leading into the attached garage. At this point, Officer Schenk noticed that the driver's side door to Zimmerman's car was open. Zimmerman said she did not put her cards on the floor or leave the car door open. Officer Schenk also found a pocket knife on the front porch of the residence, along with a shirt in the front yard. Neither of those items were Zimmerman's. On rebuttal, Officer Schenk testified he went back to Zimmerman's house during the trial and took pictures looking from the kitchen down the hallway and to the garage. Those photographs showed there is no window in the door from the garage to the hallway and how difficult, if not impossible, it is to see the garage door from the kitchen area.

Ramey took the stand in his own defense. He admitted to being a drug addict. He was drinking beer and Crown Royal on the day in question. He said he also had taken some pills for pain, but he did not know what they were. Ramey had his dog with him during the incident. When Ramey passed Zimmerman's home, he began having problems breathing and his chest was constricting. He pulled off his shirt, and his hat fell off his head. He walked up to Zimmerman's front door and knocked to try and get someone to answer. He said his life began flashing before his eyes. When no one answered the door, he turned the knob and pushed really hard. He heard a loud popping sound as he pushed through the door.

Ramey testified he knew he should not have been in the house, but he was afraid for his life and just wanted to use a phone to call for help. When Ramey came into contact with Zimmerman, he said he held his hands up, backed away, and tried to look like he posed no threat to her. He asked Zimmerman for help, but she picked up the phone and went outside. Ramey said he told Zimmerman to call for an ambulance. Ramey said he still felt cold, but he needed something to drink. As he was looking around the kitchen, Ramey said he saw a car in the garage and decided he could not wait for the ambulance. He grabbed Zimmerman's wallet and car keys and took them to the front door looking for Zimmer-

man. When he could not find her, he headed to the garage because he needed to go to the hospital. The step down into the garage caught Ramey by surprise, and he dropped Zimmerman's wallet causing the contents to spill onto the floor.

In the garage, Ramey opened the car door and then decided it was wrong to take someone else's car. Feeling thirsty again, Ramey went back into the kitchen and started looking through the kitchen cabinets. Ramey testified he heard a noise coming from the back room and his first thought was it was a person who could help him get to the hospital. When he checked the back room, no one was there, and the next thing he heard was Officer Reddy telling him to put his hands in the air. Ramey testified he put Zimmerman's car keys in his pocket and came out of the room with his hands in the air. Ramey testified he asked for a drug test to find out what pills had caused his condition.

Ramey claimed he had no intent to steal anything in the house. He said he grabbed Zimmerman's wallet and keys to take them to her so she could drive him to get help. He denied taking any money out of Zimmerman's wallet.

In front of the jury, Ramey discussed the drug and criminal damage to property charges he had pled guilty to before the start of the trial. The State had charged Ramey with aggravated burglary, misdemeanor theft, misdemeanor criminal damage to property, felony possession of methamphetamine, possession of drug paraphernalia, and vehicle burglary. On the day of trial, Ramey pled guilty to the charges of criminal damage to property, possession of methamphetamine, and possession of drug paraphernalia. The jury convicted Ramey on the remaining charges. The trial court sentenced Ramey to a presumptive term of 130 months' incarceration on the aggravated burglary conviction and then concurrent terms on the remaining convictions.

Ramey appeals.

## PROSECUTORIAL MISCONDUCT

Ramey first argues multiple instances of prosecutorial misconduct denied him a fair trial. We agree.

The State has made sure we understand that because Ramey pled guilty at trial to a number of counts, any resolution on this case does not affect Ramey's convictions for drug possession, possession of drug paraphernalia, and criminal damage.

Appellate review of prosecutorial misconduct allegations involves a two-step process. First, we must decide whether the comments were outside the wide latitude a prosecutor is allowed in discussing the evidence. If so, there was misconduct. Second, if misconduct is found, we must determine whether the improper comments prejudiced the jury and denied the defendant a fair trial. See *State v. Marshall*, 294 Kan. 850, 856, 281 P.3d 1112 (2012).

There are several factors to consider in analyzing this second step, namely whether the misconduct (1) was gross and flagrant; (2) was motivated by prosecutorial ill will; or (3) would have likely had little weight in the minds of the jurors because the evidence was of such a direct and overwhelming nature. None of these three factors is individually controlling. 294 Kan. at 857. Additionally, any prosecutorial misconduct must meet the "dual standard" of both constitutional harmlessness and statutory harmlessness to uphold the conviction. See *State v. Tosh*, 278 Kan. 83, 97, 91 P.3d 1204 (2004) (stating that before the third factor can ever override the first two factors, appellate court must be able to say harmlessness tests of both K.S.A. 60-261 and *Chapman v. California*, 386 U.S. 18, 22, 87 S. Ct. 824, 17 L. Ed. 2d 705 [1967], have been met).

*Inadmissible Evidence*

During cross-examination, the prosecutor asked Ramey, "Why don't you tell the jury what convictions you have that involve theft or dishonesty." Defense counsel objected and requested a mistrial, claiming Ramey had not opened the door to that evidence. The prosecutor disagreed. The trial judge held, "As far as the objection to the question, I will sustain that. As to a mistrial, there's been no criminal history that's been introduced into evidence and that's denied." On appeal, Ramey claims there was no evidence in his direct testimony that even remotely attempted to bolster his own credibility. Ramey argues the prosecutor did not point to evidence

that showed Ramey had opened the door. The court never asked the prosecutor to provide justification.

The prosecutor's comments were erroneous and outside of the wide latitude allowed the prosecutor. K.S.A. 60-421 provides that no evidence of a defendant's prior crimes "shall be admissible for the sole purpose of impairing his or her credibility unless the witness has first introduced evidence admissible solely for the purpose of supporting his or her credibility." On appeal, the State cites no examples in Ramey's testimony where he opened the door to evidence of his prior crimes.

Of course, the preferred practice is for the prosecutor to first raise the issue of K.S.A. 60-421 evidence to the trial judge, outside the presence of the jury, to avoid possible prejudice to the defendant in the event the trial court refuses to allow the prior crimes evidence.

Next, Ramey objected to the following questioning of Zimmerman by the prosecutor:

"Q. . . . I found the section, Ms. Zimmerman, about the previous testimony, when Mr. Ramey's attorney asked you questions. Okay. Do you recall him asking you: And you indicated that you did not know Mr. Ramey before? . . .
"A. No.
"Q. And your answer was no, right?
"A. I have never seen him before.
"Q. Okay. The next question he asks was . . . : Had you ever been drinking with him at all—
    [DEFENSE COUNSEL]: Objection.
. . . .
"A. Not unless he comes to bingo.
    "[DEFENSE COUNSEL]: Objection. Relevance to these proceedings. I wasn't even the attorney then.
    "[PROSECUTOR]: He is still bound by prior attorney's actions.
    "THE COURT: Objection is overruled. The court will note that [defense counsel] was not the attorney at that time for Mr. Ramey.
    "[PROSECUTOR]: Okay. No further questions. Thank you."

Ramey argues this testimony was irrelevant and a tactless question by prior defense counsel. He contends the prosecutor repeated this question for the sole purpose of inflaming the jury against him. The State argues it is clear from the entire trial record that the prosecutor asked these questions as part of the presenta-

tion of inconsistent statements made by Ramey regarding the circumstances of the case and why he entered Zimmerman's home. The State argues even if it was erroneous, the error was brief and the topic was not revisited by the prosecutor.

This court has previously addressed claims of prosecutorial misconduct for statements made before a judge at the preliminary hearing and at sentencing. See *State v. Roland*, No. 101,879, 2010 WL 1078454, at *1-3 (Kan. App. 2010) (unpublished opinion) (sentencing), *rev. denied* 292 Kan. 968 (2011); *State v. Clelland*, No. 93,001, 2005 WL 1805250, at *3-5 (Kan. App.) (unpublished opinion) (preliminary hearing), *rev. denied* 280 Kan. 985 (2005), *cert. denied* 548 U.S. 912 (2006). In both *Roland* and *Clelland*, the appellate court grappled with the question of whether to apply the traditional prosecutorial misconduct standard that is normally applied in jury trials. Ultimately, both panels applied the traditional standard. *Roland*, 2010 WL 1078454, at *2; *Clelland*, 2005 WL 1805250, at *3. The problem in the case at bar is that the statements complained of by defense counsel were questions made by prior defense counsel at the preliminary hearing. Further, prior defense counsel's questioning of Zimmerman on this topic continued for four additional questions into Zimmerman's drinking habits. The prosecutor's question during trial was a repeat of one of the questions asked by defense counsel at the preliminary hearing. There was no attempt by defense counsel to question Zimmerman at trial about her drinking habits. There was no valid reason to refer to the previous question.

*Accusations of Lying*

Next, Ramey contends the prosecutor improperly accused him of lying several times throughout the trial either during cross-examination or closing argument.

During cross-examination, the following questioning occurred:

"Q. [PROSECUTOR:] You told us your version of why you went into the house that night, right?"
"A. [RAMEY:] Yes.
"Q. You expect these people to believe that version, don't you?
    "[DEFENSE COUNSEL]: Objection. That's argumentative.
    "THE COURT: Overruled. ' ·/

"A. Yeah. I would like them to believe that."

. . . .

"[DEFENSE COUNSEL]: Objection. That asks for a conclusion, how is he supposed to know . . . .

"[PROSECUTOR]: He can answer the question, if he knows, then he can answer the question rather than be instructed on how to answer by his attorney."

During closing argument, the prosecutor made the following comments:

"Attorneys don't just make stuff up out of thin air. They have to have reason[s] to ask those questions. And he comes up with this bizarre version, that they were drinking buddies. That's insulting. . . .

. . . .

". . . And he comes up with this version that you heard yesterday that his chest hurt, he was breathing so hard. Oh, I'm in terrible shape, right? . . .

. . . .

"He is cognizant enough at marker 28:56 to tell the officer I asked her to call the police. I asked her to call the police. He is already formulating some story, some defense. . . .

. . . .

". . . Why he comes up with this theory today over the last two days—let's face it, it's his last-ditch hope. It's his last ditch hope.

. . . .

". . . He makes up this version about how he saw the car from the kitchen. That's physically impossible. It's really hard to keep stuff straight when you make it up on the fly."

Ramey argues that just like what occurred in *State v. Elnicki*, 279 Kan. 47, 105 P.3d 1222 (2005), the prosecutor avoided the words lie and liar but still used the phrases "makes up" and "comes up with" which can only be construed as indicating that Ramey was lying. In *Elnicki*, a prosecutor's comments about the defendant's " 'yarn,' " " 'fairy tale,' " " 'fabrication,' " " 'tall tale,' " and " 'spin' " constituted improper commentary on the defendant's credibility. See 279 Kan. at 57-68.

Ramey also argues the prosecutor's statement that defense counsel was instructing Ramey how to testify insinuated that Ramey was lying and defense counsel was suborning perjury.

The State responds that the prosecutor's questioning of Ramey's lack-of-intent defense was within the wide latitude granted a prosecutor during cross-examination of a witness.

However, the State concedes the prosecutor's comments that the bizarre story of Ramey and Zimmerman being drinking buddies was insulting, that Ramey was already formulating his defense when he asked Zimmerman to call the police, that the intoxication defense was his last ditch hope, and that he made up the version of seeing the car in the garage were all outside of the wide latitude granted the prosecutor. See *State v. Graham*, 277 Kan. 121, 129, 83 P.3d 143 (2004) (similar comments about defendant fabricating a story; court stated that rather than being commentaries on the evidence, the comments were expressions of the prosecuting attorney's opinion the defendant was fabricating her testimony); see also Gershman, Prosecutorial Misconduct § 11:27, p. 530 (2d ed. 2013) ("Courts caution prosecutors against characterizing testimony as a 'lie' because such categorical and conclusory opinions make the prosecutor an unsworn witness and invade the province of the jury to determine credibility."). We agree that the prosecutor's comments were well outside the wide latitude granted the prosecutor in arguing the case to the jury and were obviously intentional and prejudicial.

### Vouching for Witness' Credibility

Next, Ramey argues the prosecutor improperly vouched for Zimmerman's credibility during closing argument. We agree. The prosecutor stated:

"Because the only answer that they had is, is that this lady right here, made a mistake on the amount of money that she reported to the police the first time. I mean, seriously, do you think she lied to the police? Do you think she made this up? Do you think she fabricated some story so she could get $14 back? Come on, that's insulting."

Ramey contends Zimmerman's credibility was not for the prosecutor to judge, but rather for the jury to determine, and the prosecutor's statements were outside the latitude of permissible conduct. The State responds that the crucial issue was not how much money Ramey took but whether he took any at all. The State contends the comment was not to bolster Zimmerman's credibility but a statement by the prosecutor in stating Zimmerman was not wrong about missing her money.

In *Elnicki*, during the rebuttal portion of the State's closing argument the prosecutor commented on the victim's credibility, telling the jury, " '[Y]ou know she was telling you the truth.' " 279 Kan. at 64. Noting that this statement was in response to defense counsel's argument that the victim was lying, the *Elnicki* court quoted *State v. McKinney*, 272 Kan. 331, 347, 33 P.3d 234 (2001), and then stated: "While the prosecutor's comments here about [the witness' credibility] are not necessarily prejudicial, they are nevertheless error." 279 Kan. at 64. In the instant case, the prosecutor's comment that he found defense counsel's questioning of whether Zimmerman would lie about $14 to be insulting was improper personal comment on the prosecutor's part. The prosecutor was within his duty to comment that Zimmerman may have mistakenly reported the amount of money to the police. However, the prosecutor improperly vouched for her credibility with his personal opinion that the defense's theory was insulting.

*Misstated Facts and Law*

Next, Ramey argues the prosecutor misrepresented several facts during closing argument by stating that Ramey admitted everything on all the charges except intent to commit the crimes. Ramey points out that he claimed he never took any money from Zimmerman's purse for the theft charge and he admitted to opening Zimmerman's car door for the vehicular burglary but never entered the car.

On the first alleged misstated fact, the State indicates the complaint and the jury instructions charge the theft of keys and/or United States currency. Consequently, Ramey does not dispute that he was in possession of Zimmerman's car keys. Similarly, he does not dispute that he opened Zimmerman's car door. It was then for the jury to determine Ramey's intent based on the car door being open, the contents of Zimmerman's wallet on the garage floor and steps, and Ramey's possession of her car keys. We do not find the prosecutor misstated the facts of the case in light of the evidence and the stipulations of guilt to the other charges.

Ramey also argues the prosecutor misstated the law in two instances during closing argument. First, the prosecutor stated,

"[Defense counsel] also argues that [Zimmerman] left the house, therefore it can't be aggravated? The law is very clear. If she's in there at any given time, it's an aggravated burglary." Ramey argues the timing of when he decided to commit the theft was critical if the intent did not represent itself until after Zimmerman left her house. If the intent and human presence do not match up, Ramey argues he would have been guilty of burglary but not aggravated burglary. Thus, he argues the prosecutor's argument led the jury to believe the opposite. Second, Ramey claims the prosecutor improperly argued that since he pled to the general intent crimes, he had the requisite intent to commit the specific intent crimes of burglary and theft. He argues voluntary intoxication may negate the intent required to commit a theft or burglary, but it does not negate the intent necessary to commit criminal damage to property. See K.S.A. 2013 Supp. 21-5205; *State v. Hernandez*, 292 Kan. 598, 606, 257 P.3d 767 (2011). Ramey argues the prosecutor's misrepresentation was intentional in light of the fact that Ramey did not initially request an instruction on voluntary intoxication but only did so after the prosecutor argued it was required based on the evidence.

We do not find the prosecutor misstated the law on either the elements of aggravated burglary or voluntary intoxication. In *State v. Fondren*, 11 Kan. App. 2d 309, 310, 721 P.2d 284, *rev. denied* 240 Kan. 805 (1986), the court stated that aggravated burglary contains the requirement that the place of the burglary be occupied by a human being *at some point during the course of the burglary*. The prosecutor's comment was not a misstatement of the law as found in *Fondren*. Further, the jury instructions properly instructed the jury on the elements of aggravated burglary and also included three fact-specific voluntary intoxication instructions. Even if there was a slight misstatement of the law, it did not amount to reversible error.

*Inflammatory Comments*

Next, Ramey argues the prosecutor made inflammatory comments throughout the trial that denied him a fair trial. The prosecutor made several comments about Ramey being a drug addict.

During closing argument the prosecutor stated, "Let's start off with what is the theme of the day? I am too stoned to be guilty. Is that it? Is that where we are at?" Ramey argues these statements were intended to enrage the jurors rather than inform them, and resulted in a conviction based on the outrage over his drug abuse.

We find no error in the prosecutor's repeated comments about Ramey being a drug addict. Ramey's claim of being a drug addict and the use of a voluntary intoxication defense made his drug addiction an appropriate subject for argument. The prosecutor may have been relentless in discussing Ramey's drug problems, but it was certainly within the wide latitude allowed the prosecutor in exploring the evidence.

During rebuttal argument, the prosecutor stated:

"During voir dire, [defense counsel] told you the tragic story of the jury trial he had when the rape victim made up the story. You know, does it have anything to do with this case or a jury selection question? No, it was designed to get your sympathy. To start thinking about sympathy.

"[DEFENSE COUNSEL]: Objection. It was part of reminding them to follow that . . . instruction. Not to hold against a person who didn't testify. At that point we didn't know if he was going to testify or not."

Ramey argues the prosecutor inflamed the jury with comments made by defense counsel that had no bearing on his guilt or innocence.

Clearly both the prosecutor and defense counsel tried to persuade the jury to believe their respective side of the case. Both attorneys in this case argued passionately for their clients. While defense counsel reprimands the prosecutor for arguing that defense counsel was only trying to get sympathy from the jury, that is exactly what defense counsel was doing, and it was even more egregious at other times. In his opening statement, defense counsel stated, "Ms. Zimmerman's the one who was frightened in her own home. I had that happen to me a long time ago and it's no day at the beach." Defense counsel's cite of a personal example of when he was the victim of a crime had no relevance to the case and was an obvious attempt to make the jury feel sympathetic toward defense counsel.

During closing argument the prosecutor said, "Remember the preliminary hearing that Ms. Zimmerman had to go through? Remember that testimony." Ramey argues it is improper for the prosecutor to ask the jury to focus on the pain that testifying may have caused the victim-witness. See *Tosh*, 278 Kan. at 90-93. We agree.

A prosecutor should not make statements intended to inflame the passions or prejudices of the jury or to divert the jury from its duty to decide the case based on the evidence and the controlling. law. *State v. Cravatt*, 267 Kan. 314, 336, 979 P.2d 679 (1999). Similar to the " 'rape her again' " comments in *Tosh*, 278 Kan. at 90, the court in *State v. Villanueva*, 274 Kan. 20, 33-36, 49 P.3d 481 (2002), considered the prosecutor's closing argument, " 'The funny thing is that's not the—that's not the only rape that took place in this case. The second rape . . . took place when she had to come in here and had her character attacked and her memory attacked.' " The court found the prosecutor's comments were outside the scope of proper argument and improperly appealed to the sympathies of the jury but did not demonstrate ill will when considered in light of the trial record as a whole. 274 Kan. at 34-35. In the case at bar, we agree the prosecutor's comments were outside the wide latitude granted the prosecutor in arguing the case when he referenced the pain caused to the victim by having to testify in the preliminary hearing.

*Ramey's Desire for a Jury Trial*

Next, Ramey argues the prosecutor improperly commented on his right to a jury trial.

During the prosecutor's cross-examination of Ramey, the following occurred:

"A. [RAMEY:] Well, I was trying to explain my reason for going into the home. And what my intent was, because it says you got to follow all the elements of the law. I don't feel that I had criminal intent.

. . . .

"Q. [PROSECUTOR:] Okay. And you said just a minute ago, that you don't think you're guilty because the State cannot prove all of the elements of the crimes; correct?

"A. Correct.

"Q. Okay. Did you do legal research and have a friend from the outside send you legal research so you could formulate this defense?

"[DEFENSE COUNSEL]: Objection, judge. This is outside the scope of direct exam.

"[PROSECUTOR]: It goes to his intent. It goes to the very nature of the testimony that he has given and the testimony that he is wanting these people to believe that he could not form the intent to burglarize this house, steal this property, or burglarize the vehicle.

"[DEFENSE COUNSEL]: But it doesn't go to the intent of what happened October the 10th. Again, he is talking about something that happened some time later when he started to do some research.

"[PROSECUTOR]: I am laying the foundation for that Judge. I can prove it.

"THE COURT: I am going to sustain the objection now, but allow you to go ahead and ask the questions that you are laying the foundation for.

. . . .

"Q. Okay. We've established that. You did your own legal research on the 10th, correct?

"A. Yeah. I wanted to know what the statute said.

"Q. Okay. And did you have this discussion with your girlfriend that if you could show that the intent wasn't there, that you could beat the meth, the criminal damage, the criminal trespass, et cetera?

"A. Possibly.

"Q. Okay.

"A. Because it goes along with the truth.

"Q. Pardon?

"A. Never mind."

In closing argument, the prosecutor touched on the subject again with the following comments:

"So he does some research. Has the girlfriend send him some research. How can he get out of it? How can he beat this charge? How can he beat it? Voluntary intoxication. That's the only possible defense left, right? That's the only possible defense left. And he comes up with this version that you heard yesterday that his chest hurt, he was breathing so hard. Oh, I'm in terrible shape, right? How did he get there? Crown Royal, marijuana, meth, Valium, and dilaudid. Okay. Voluntary intoxication. So, I can't be guilty because I was so stoned, right?"

Ramey argues the prosecutor used Ramey's desire to contest his guilt as evidence that he was guilty.

The prosecutor did not expressly question Ramey's right to have a jury trial. See *State v. Tosh*, 278 Kan. 83, 91, 91 P.3d 1204 (2004) (Tosh argued that it was highly improper to tell the jurors that they should consider why he was exercising his constitutionally guar-

anteed right to a jury trial.). In *State v. McReynolds*, 288 Kan. 318, 324, 202 P.3d 658 (2009), the prosecutor told the jurors in voir dire that " 'any person accused, whether they're guilty or not, has a right to have a jury trial, even guilty people.' " The *McReynolds* court found the prosecutor's statement was not outside the bounds of permissible statements. The court held: "Even if the reference to guilty people deserving a fair trial was, in isolation, a technically inaccurate statement of the law, the entire statement clearly placed the burden on the State to prove guilt and clearly articulated the presumption of innocence." 288 Kan. at 324.

In the case at bar, the prosecutor's questions covered how Ramey came to the understanding that voluntary intoxication would be a defense to the charges. Ramey opened the door to this questioning. While explaining that he did not have any criminal intent when he went in Zimmerman's house, he said, "And what my intent was, because it says you got to follow all the elements of the law. I don't feel that I had criminal intent." The prosecutor explored how Ramey came to that understanding by doing his own research and having his girlfriend research the issue. We find the prosecutor's questions were within the evidence presented by Ramey and a proper exploration of Ramey's testimony that he had no intent to commit the crimes in this case.

*Personal Opinion*

Last, Ramey argues the prosecutor improperly gave his personal opinion regarding Ramey's guilt. During closing argument, the prosecutor stated:

"Legally, Mr. Ramey and his attorney drafted this stipulation and put it into the record that he intentionally committed criminal damage on October the 10th.

"So what you have to do to find him not guilty on the others is ignore the law, ignore the facts, and ignore Mr. Ramey and his attorney.

"Ladies and gentleman, it's real simple. Go back there, sign the jury verdict form guilty on all counts. Thank you."

The complained-of statement was not the prosecutor's personal opinion of the case. Rather, he stated that only if you ignore the facts, law, and Ramey's stipulation to the other offenses would you be able to find him not guilty. The prosecutor's comment was a

reverse way of saying that all the evidence proves Ramey is guilty. We do not find the comment was outside the wide latitude allowed the prosecutor in arguing the case to the jury during closing argument.

*Did Prosecutorial Misconduct Produce Cumulative Error Requiring Reversal?*

In support of the argument that the prosecutor's comments were gross and flagrant, Ramey states the prosecutor was experienced and there are no recent developments in the law that would justify the comments. He argues the prosecutor committed misconduct 23 times and, thus, the misconduct was not isolated by any stretch of the imagination. While we do not count 23 instances of misconduct, we believe the prosecutor committed misconduct in several instances: (1) the allegation of prior crimes of theft or dishonesty; (2) the bizarre nature of Ramey's story and how he allegedly manufactured his defense; (3) the vouching for Zimmerman's credibility; (4) the inappropriate question about Zimmerman's drinking habits; and (5) the trial causing more pain to Zimmerman.

Ramey argues ill will is present again by the repeated nature of the misconduct and specifically through the misconduct of the prosecutor improperly stating the law on voluntary intoxication and his disregard for courtroom decorum by repeatedly stating he could ask any question he wanted on cross-examination. Ramey maintains the repeated misconduct severely affected his trial because he had presented sufficient evidence of a voluntary intoxication defense and also had shown the evidence of the vehicular burglary was extremely circumstantial because there was no evidence he ever got into the car. Ramey argues the evidence was not overwhelming against him in this case and the State intentionally benefitted from the prosecutor's misconduct.

The State argues virtually all of the comments of the prosecutor fell within the wide latitude given to him in cross-examining witnesses or arguing the case to the jury. The State contends that when some of the statements are placed in context, they were simply comments on the evidence. The State contends the prosecutor aggressively challenged Ramey's voluntary intoxication defense as

any good prosecutor would do. Additionally, the State indicates the trial court sustained many of defense counsel's objections and the subject was not approached again. The State also argues the evidence was overwhelming and the jury was saddled with the job of deciding Ramey's intent when he broke down Zimmerman's door that evening. The State maintains the jury simply did not buy Ramey's defense that he was only looking for a way to get medical help as quickly as possible and Zimmerman's house provided the best option.

It is proper for a prosecutor to assert "reasonable inferences based on the evidence and that when a case turns on which of two conflicting stories is true, certain testimony is not believable." *State v. Davis*, 275 Kan. 107, 121, 61 P.3d 701 (2003).

Within the context of the multiple statements or actions by the prosecutor that constituted misconduct, Ramey contends these errors cumulatively denied him a fair trial.

" ' " 'Cumulative trial errors, when considered collectively, may be so great as to require reversal of the defendant's conviction. The test is whether the totality of circumstances substantially prejudiced the defendant and denied the defendant a fair trial. No prejudicial error may be found upon this cumulative effect rule, however, if the evidence is overwhelming against the defendant.' " ' " *State v. Baker*, 281 Kan. 997, 1017, 135 P.3d 1098 (2006).

We agree. As cited above, the prosecutor made many comments that were obviously improper and prejudicial. While there was substantial evidence against Ramey, the facts also made for a plausible voluntary intoxication defense. Because the improper comments were so numerous and prejudicial, and because the State's case, although strong, was not overwhelming, we find there was cumulative error which requires reversal and remand for a new trial.

### OTHER APPEAL ISSUES RAISED

*Jury Question*

Ramey argues the trial court misrepresented the law in responding to a question submitted by the jury. We disagree.

After the jury has retired for deliberation, it may seek additional information on a point of law from the trial court. K.S.A. 22-

3420(3). Our Supreme Court has set forth the appropriate standard of review in matters involving K.S.A. 22-3420(3):

"A trial court may not ignore a jury's request submitted pursuant to K.S.A. 22-3420(3) but must respond in some meaningful manner or seek additional clarification or limitation of the request. It is only when the trial court makes no attempt to provide a meaningful response to an appropriate request or gives an erroneous response that the mandatory requirement of K.S.A. 22-3420(3) is breached. Once the trial court attempts to give an enlightening response to a jury's request or seeks additional clarification or limitation of the request, then any issue as to the sufficiency or propriety of the response is one of abuse of discretion by the trial court." *State v. Boyd*, 257 Kan. 82, Syl. ¶ 2, 891 P.2d 358 (1995).

In *State v. Jones*, 41 Kan. App. 2d 714, 722, 205 P.3d 779 (2009), *rev. denied* 290 Kan. 1099 (2010), the court indicated this passage from *Boyd* suggests a two-step analysis to review a trial court's application of K.S.A. 22-3420(3): (1) A de novo review to determine if the statute has been breached because the trial court failed to respond to the jury's question or because the trial court provided an erroneous response to the question; and (2) if the trial court has complied with these mandatory statutory requirements, our court will employ an abuse of discretion standard in evaluating the sufficiency or propriety of the response.

After the jury retired for deliberations, it submitted the following question about Instruction No. 7, part 3: "Does it mean that before he broke down the door did he think about doing so to steal or after he got in there and saw the purse he decided to steal $ or keys?"

After discussion and agreement by counsel, the trial court responded to the jury's question by referring the jury to the case of *State v. Gutierrez*, 285 Kan. 332, 172 P.3d 18 (2007), and specifically directing them to paragraphs 2, 3, and 4 of the syllabus:

"Aggravated burglary is defined in K.S.A. 21-3716 as 'knowingly and without authority entering into or remaining within any building . . . in which there is a human being, with intent to commit a felony . . . therein.' As used in that statute, the phrases 'entering into' and 'remaining within' refer to legally distinct factual situations. The entering into element is satisfied when the evidence shows that a defendant crossed the plane of a building's exterior wall. Remaining within refers to a defendant's presence in the building's interior after any entering into, authorized or unauthorized, has been accomplished."

"Both unauthorized entering into and unauthorized remaining within may be present in a single burglary or aggravated burglary case. Neither is necessarily instantaneous."

"To commit a burglary or aggravated burglary, a defendant's formation of intent to commit a felony in a building must, at some point, coexist with an unauthorized entering into the building or an unauthorized remaining within it. It is not necessary, however, to prove remaining within burglary or aggravated burglary to show that the intent to commit a felony was precisely contemporaneous with any withdrawal of a defendant's authority to be inside the building."

On appeal, Ramey morphs the trial court's responsibility in addressing the jury's question into a situation where the trial court must also inform the jury as to other elements of the crime of aggravated burglary, namely that a human being must be present within the building. See K.S.A. 2013 Supp. 21-5807(b). Our reading of the jury's question does not extend that far. The jury's question was limited to the intent to commit the crime. When the trial court addressed the jury's question, it did not somehow negate the jury's responsibility to still find the other elements of the crime beyond a reasonable doubt. The jury was specifically instructed that its verdict "must be founded entirely upon the evidence admitted and the law as given in these instructions." In responding to the jury's question, the trial court correctly instructed the jury on the law regarding the intent to commit the underlying felony for aggravated burglary and whether the intent to commit the felony was in existence when the defendant entered the house or whether the intent could surface later upon entry. See *Gutierrez*, 285 Kan. 332, Syl. ¶¶ 2, 3, 4. There was no abuse of discretion in the trial court's answer to the jury's question.

*Lesser Included Offense Instruction*

Along the same lines as the previous issue, Ramey argues the trial court should have given the jury a lesser included offense instruction for burglary. He did not request an instruction for simple burglary at trial, but his request for the lesser included offense instruction of attempted aggravated burglary was denied. The State does not address Ramey's argument, and it appears by the argument in its appellate brief the State mistakenly understood Ramey's

claim to be that the trial court erred in failing to instruct on the lesser included offense of attempted aggravated burglary.

When a defendant fails to request or does not object to the trial court's failure to give a lesser included offense instruction, it is reversible error only if the failure to give the instruction was clearly erroneous. See K.S.A. 2013 Supp. 22-3414(3); *State v. Harris*, 293 Kan. 798, 806, 269 P.3d 820 (2012). Since Ramey did not ask for a burglary instruction as a lesser included offense of aggravated burglary, we will use the clearly erroneous standard of review when making our decision on this point.

To determine whether it was clearly erroneous for the trial court to fail to give an instruction, we must decide whether an error occurred. If the trial court erred in failing to give a particular instruction, we will then decide whether it was a reversible error. The test for clear error requiring reversal is whether we are firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. The burden of showing clear error remains with the defendant. See *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012).

Ramey does not cite any relevant cases addressing similar facts. He correctly points out that burglary is properly considered a lesser included offense of aggravated burglary. See K.S.A. 2013 Supp. 21-5109(b); K.S.A. 2013 Supp. 21-5807(a), (b). Ramey had the right to an instruction on simple burglary if the evidence, viewed in the light most favorable to his theory of the case, would justify a jury verdict based upon that theory and the evidence did not exclude a theory of guilt on the lesser offense. See K.S.A. 2013 Supp. 22-3414(3); *State v. Williams*, 268 Kan. 1, 15, 988 P.2d 722 (1999). To warrant an instruction on simple burglary, there had to be evidence that no one was in the home during the burglary. Ramey argues a reasonable jury could have found him guilty of simple burglary. He contends that if he remained in Zimmerman's house with the intent to commit a theft, he needed to form that intent while Zimmerman was still in the house. He cites *State v. Fondren*, 11 Kan. App. 2d 309, 310, 721 P.2d 284, *rev. denied* 240 Kan. 805 (1986), where the court stated that aggravated burglary

contains the requirement that the place of the burglary be occupied by a human being *at some point during the course of the burglary*.

We have consistently held that the presence of a person in a structure at any time during a burglary constitutes aggravated burglary. See *State v. Romero*, 31 Kan. App. 2d 609, 610-12, 69 P.3d 205 (2003); *Fondren*, 11 Kan. App. 2d at 310-12; *State v. Reed*, 8 Kan. App. 2d 615, 616-19, 663 P.2d 680, *rev. denied* 234 Kan. 1077 (1983).

Ramey's construction of the aggravated burglary statute seems to frustrate the purpose of the distinction between simple burglary and aggravated burglary, which is to recognize as a more serious crime those burglaries that can result in a dangerous and unexpected confrontation between the burglar and an occupant. See *Fondren*, 11 Kan. App. 2d at 310-12. In *Reed*, 8 Kan. App. 2d at 616-17, the court observed:

"The purpose behind the aggravated burglary statute is to describe a more serious offense than simple burglary when there is the possibility of contact between the victim and the burglar and the accompanying potential for a crime against the person to occur. This danger is just as great regardless of when during the burglary the victim comes to be in the building. . . . [T]he severity of the crime depends upon the mere presence or absence of any human being in the same structure."

Consequently, aggravated burglary does not require proof that the defendant knew there was a person present in the building at the time it was burgled. The mere presence of a person during the crime is sufficient. See *State v. Watson*, 256 Kan. 396, 400-01, 885 P.2d 1226 (1994); *Fondren*, 11 Kan. App. 2d at 311.

Ramey was not alone in the house when he pushed in the front door. His theory of defense was not that he did not have the requisite intent when he pushed in the door or that he developed that intent while inside. Rather, Ramey's theory of defense throughout the entire trial was an innocent intent based on his voluntarily drug-induced intoxication and a lack of general indicators of a burglary. If we view the evidence in the light most favorable to Ramey's theory of the case, we cannot hold that a jury could justify a verdict of simple burglary based upon that theory. See K.S.A. 2013 Supp. 22-3414(3). A verdict based on Ramey's theory of defense would be a complete acquittal, not a lesser included offense. It was not

clearly erroneous for the trial court to not instruct the jury on simple burglary as a lesser included offense.

*Apprendi*

Ramey also contends the trial court's use of his prior convictions to enhance his sentence without them being proven to a jury beyond a reasonable doubt violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution as interpreted by *Apprendi v. New Jersey*, 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000). Our Supreme Court has previously rejected this claim and continues to do so. *State v. Adams*, 294 Kan. 171, 185, 273 P.3d 718 (2012) (reaffirming *State v. Ivory*, 273 Kan. 44, 46-48, 41 P.3d 781 [2002]). We are duty bound to follow *Ivory*.

Reversed and remanded for a new trial.