NOT DESIGNATED FOR PUBLICATION

No. 116,709

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

JONATHAN PAUL JOHNSON,
*Appellant*.

MEMORANDUM OPINION

Appeal from Johnson District Court; TIMOTHY P. MCCARTHY, judge. Opinion filed April 13, 2018. Affirmed.

*Rick Kittel*, of Kansas Appellate Defender Office, for appellant.

*Shawn E. Minihan*, assistant district attorney, *Stephen M. Howe*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before BRUNS, P.J., PIERRON and POWELL, JJ.

POWELL, J.: Jonathan Paul Johnson was convicted by a jury of his peers of three counts of misdemeanor stalking and one count of felony stalking. On appeal, Johnson claims that insufficient evidence supported his felony stalking conviction and that the district court improperly answered a question from the jury. After a thorough review, we find there was sufficient evidence from which a reasonable juror could have found Johnson guilty of felony stalking, and we affirm Johnson's convictions. As to Johnson's claim that the district court improperly answered a question from the jury, we find that Johnson's counsel invited any error and, therefore, this issue is not properly before us.

1

FACTUAL AND PROCEDURAL BACKGROUND

In April 2015, the State initially charged Johnson with four counts of harassment by telephone based on voice messages and emails sent to his father in February and March of 2015. In July 2015, the State filed an amended complaint, amending the charges to misdemeanor stalking and adding two counts of felony criminal threat and one count of felony stalking. These charges were the result of Jonathan's continued actions towards his father through June 2015. In February 2016, the State filed a second amended complaint, dismissing one of the felony criminal threat charges, and at trial the district court dismissed the second felony criminal threat charge. The State proceeded to trial on four counts of misdemeanor stalking (Counts I-IV) and one count of felony stalking (Count VI).

Parenthetically, we note that Johnson does not challenge the sufficiency of the evidence used to convict him of the multiple counts of misdemeanor stalking. However, to understand the context of the case before the jury, we include in our discussion portions of the evidence before the jury on each of the counts because Johnson takes issue with the jury's finding that a reasonable person would be in fear for his or her safety, thus the context of Johnson's alleged pattern of stalking his father is necessary to resolve Johnson's insufficient evidence claim.

*Count I:  Misdemeanor Stalking*

Johnson's actions towards his father from February 2-9, 2015, were charged as misdemeanor stalking in Count I. Johnson's father first reported his son's incessant emails, calls, and voicemails to the police in early 2015 because he felt Johnson was threatening him and because he "was concerned for [his] and [his son's] safety." Due to Johnson's repeated phone calls, his father unplugged his answering machine; however, the calls did not stop and Johnson's father was forced to unplug his home phone too.

2

Johnson testified that he did not remember calling his father in February or March 2015, but he did recognize that it was his voice on the answering machine messages and explained that he was frustrated with his father for not helping to support him financially while he attended the University of Kansas. Johnson said his behavior towards his father was caused by his stress due to his financial situation and that at the time he was experiencing stress, anxiety, inner turmoil, sadness, pain, and frustration. Johnson testified that he simply wanted support from his father, that it was frustrating when his father would not return his phone calls, and that he felt neglected, which made him feel angry.

*Count II: Misdemeanor Stalking*

Sometime in February 2015, Johnson's father spoke with Johnson's mother about their son's actions. Johnson's father testified that Johnson's mother "asked that I wait [to press charges] until she had a chance to talk to him because she thought she could stop him. And I was going out of town for two or three weeks." However, Johnson's mother was not successful in getting Johnson to stop, and the voicemails and emails continued while Johnson's father was out of town. Johnson's father testified that he did not want his son to get arrested or imprisoned, but he wanted the harassment to stop. He testified: "I was concerned for my safety and his safety due to the emails and voicemails he had left me."

In early March 2015, Johnson's father reported Johnson's actions to the Leawood Police Department. Johnson's father told the officer that because of Johnson's actions, "he was in fear of his safety" and his son's safety, and he "made it clear to [the officer] that he had a gun in the house just for his personal protection." At this meeting, Johnson's father provided the police with 11 emails that he received from his son on February 18, 2015, between 4:13 p.m. and 8:19 p.m. These emails, listed below with the corresponding time sent, included several troubling statements.

4:13 p.m.: "You think threats scare me? You think money causes me to be worse? You refuse to listen to doctors but choose to adhere to indoctrinated fallacies brought on by a child molester, your mother. You're a coward. You have not a clue on the pain that resonates within, pain that kills me. I smoke two packs of cigarettes a day for the past three years. These are variables of my life that you could be—could have altered when I was in counseling, meaning that you were never there for. Your arrogance to show zero empathy to your only son manifests within.

"I wake up every day not having a father. Instead I have a greedy soulless shell of a parent, one that puts more money and time into their toy trains and Asian cunts.

"You're unsympathetic to my situation. You think going to Hale Cook makes you a man. Have you been beat up by—beat by a teacher? Have you gone to inner-city middle schools? No. You're a privileged fake fat man that was placed in your successful environment, one that you couldn't even replicate to your only son.

"You choose to save your pennies instead of forcing the issue with the courts. What right-minded woman would want to be with you[?] I don't know how to get through to you. Would killing myself prove that all I wanted was a father to be there, one that respected me, one that didn't toy with my emotions, one that's there for me.

"When you go to the police, take this. Or move to Canada. Get as far away from me as possible because that shows love.

"PS, here's another article. You don't even understand the Chinese culture. My friend at KU is from China. I've immersed myself in the culture for three years. You just close your eyes and think you know the culture. You are a nigger. I hate you. I won't change, nigger. I'll just get worse. Fuck you. [Website link omitted.]"  (Errors, punctuation, and capitalization from original omitted.)

5:44 p.m.: "The whole experience at KU has been ruined. I feel my mom's pain now, the pain of having a callous individual suck the living life out of another person. I look to my peers for understanding. . . .

". . . I sit here crying because my callous degenerative father can't see my pain; doesn't know how to relate. Can't change.

"I'm on the precipice of not giving a fuck. I've heard all the bullshit. I can't change you. I sit here and think now I'm going to change. All I see is a evil, greedy person who tries to suck the living life out of me my entire life. It kills. I cry, and then stop crying. When is crying not enough? When does hate set in? Well, it's set in.

"So I think what would change you. Would enlisting in the military and going back to harassing you be enough, enough so I could actually get a dishonorable discharge[?] Would going out and buying a gun change you[?] Would blowing my brains out in your front lawn change you[?] Ask yourself that. I'm not afraid. I don't care."

5:48 p.m.: "I stopped caring. Where's my house that my dad got me[?] Or where's my prestigious education that my daddy got me[?] . . . I get the brunt end of your shit since four. I walk around with a $60,000 debt in my name; clothes that are falling apart; a father that doesn't care. That's what I get."

5:56 p.m.: "I will change you for better or worse. I don't care. [Mother] had to beg me not to keep going. I hate you. The pain is real. Words can't convey the entire feeling you've put me through here."

6:02 p.m.: "All you have to do is listen, be there. Fuck you. I can't respect someone that's never felt what I feel or what they've put me through. Who would? You should have gotten [your fiancée] on food stamps; had her ride the bus; put her in a house that has no walls. Fuck you."

6:25 p.m.: "I sit here. I want to die. I want to move on from this pain. I want to screen shot all this and post it to my public Facebook wall so everyone can see. But that wouldn't garner enough attention. I want to make this a national or statewide debate."

6:27 p.m.: "I fucking hate you. Fucking nigger. Call [mother] now. Call her. Why did it take three years for you to do that?"

6:31 p.m.: "Fucking greedy cow. Move already. Run away, coward. Run away."

8:12 p.m.: "I'm buying a gun. Fuck you. Fuck you."

8:14 p.m.: "Nigger [father], fuck you. Move already, you fucking piece of shit."

8:19 p.m.: "You piece of shit scum. You nigger that doesn't listen. What if I just jumped off the psychology department building right now[?]"

These emails prompted the State to charge Johnson with misdemeanor stalking in Count II.

*Count III: Misdemeanor Stalking*

At the end of March 2015, Johnson's father again met with the police after Johnson continued his actions towards his father. At this meeting, Johnson's father

provided the police with several voicemails he received from his son between March 3 and March 23, 2015. In the first voicemail Johnson stated:

Voicemail #1:   "God, [Unintelligible], do you think I give a fuck anymore? Fuck you! Fuck you, you sociopathic fucking piece of shit. I wish you would die! You get that! You hear me now? You fuck! You fake fuck! You fat piece of fucking trailer trash! Fuck you! I fucking hate everything about you. [Unintelligible]! You fucking piece of fucking shit! Fuck you! You hear me, I don't give a fuck! I'm gonna call you crazy! I'm gonna call you whenever I fucking please! I'm going to call—I have no respect for you! You fucking mooch! You mooched off of my grandma! [Unintelligible]! You fucking sorry shit! You nonproviding fucking craphole! If I had some money I would stick it up your fucking asshole!"

Voicemail #2:   "Heard you jumped off the downtown bridge! Ha! [Unintelligible] your $859 a month! A big fucking, a big, big amount of money that you fucking provided, you stupid piece of shit! You are! You are a fucking idiot! I'm telling you what I'm going to do and what I want to do, and then you fuck my life over! That's what you do! That's what you fucking do, you stupid piece of shit! You fucking turkey fuck! Gobble, gobble, gobble turkey! Gobble, gobble, gobble turkey! Turkey gobble, gobble coward nigger! I have no respect for you, because you lost the ability to respect your own fucking son! You piece of shit!"

Voicemail #3:   "What have you been doing nigger [father]! What have you been doing nigger [father]! Call me something nigger [father]. Huh? Call you something! Yeah, honestly fucking do something, you big fat piece of shit! Fucking do something you lazy son of a bitch! Fucking do something. You think I give a fuck anymore? Really? Really! I don't give a fuck about you. You fucking nigger! Ah, ah, I've got all my money! I'm so, I'm so powerful! Ah, you fucking nigger! You stupid piece of shit! What has it done when this whole situation is over with? Ha! You're not going to have nobody but that dumb [unintelligible]! You'll have to move out the city, and I won't be around! I won't! I don't give a fuck! Ha, [Unintelligible] that's what the fuck you do! You hide the shit, you dumb nigger! Run away, run away, run away, just like [unintelligible], run away! Run, run, run! Run, run, run!"

These voicemails were the basis for the State's charge of misdemeanor stalking against Johnson in Count III.

*Count IV:  Misdemeanor Stalking*


Johnson's father also provided the police with five voicemails he received from his son between March 24 and March 30, 2015.  These voicemails formed the basis for the State's charge of misdemeanor stalking against Johnson in Count IV.


Voicemail #1:  "Look, I'm going to forewarn you, because you put me in this fucking situation. You made me go back to my fucking stupid retarded degenerative fucking idiotic fucking nigger [mother]! It's your fucking problem! But Monday, if I don't get any type of respect, by trying to go get 8 blocks of fucking cut stone from 1900, and I get pushed out as if I don't have a place to stay in Kansas City, all week I will call you hundreds and hundreds and hundreds and hundreds of thousands of times, day and night! You and [your fiancée]! All week! All fucking week! I really don't give a fuck! You got that!? You think this shit's fun, you stupid piece of shit! You really think it's fun!?"

Voicemail #2:  "I'm going to start telling people I'm going to kill 'em! Will that get me somewhere? Will that? Do you think that will get me anywhere!? I don't give a fuck anymore. I'm gonna kill [mother]! I'm going to kill you stupid fucking niggers! You come up with these ideas, that I don't know how to fucking take care of shit, and I have fucking [unintelligible] that says seven years eight years now, the check hasn't fucking come undone you stupid fucking pieces of fucking shit! You got that? You dumb fucking piece of shit! Fucking stupid fucking piece of shit. I'm fucking tired of you guys! You guys are fucking full of shit! Manipulative fucking pieces of fucking shit! I get stuck with the fucking crap, get stuck out there, and it just falls apart! Because you guys fucking take over everything and fucking increase the prices of everything, and you think everything is perfect! Fuck you, you fucking stupid piece of shit!"

Voicemail #3:  "Hey, what's happened? Like, you know, I'm locked up and I'm like in an institution, because all of this shit! And I don't have kids, you fucking dumb fuck! I won't continue this fucking mindless! I won't choose to [unintelligible], it doesn't really fucking matter. I mean people buy all the time you piece of shit! Fucking piece of shit. Fucking stupid, fucking piece of fucking shit! You really are! You really are! Both of you! You're fucking stupid fucking pieces of shit! [Unintelligible.] [Your fiancee's] going to sit there and say, 'well, well, I, I, I, we're so smart! You're so smart!' Well, you should have asked [your fiancée] about three years ago whenever I started hating you guys! I fucking hate you guys! You fucking pieces of shit! I wish you would die, you fat fucking slob, fucking nigger fuck! Fuck you! You fucking piece of shit! You stupid fucking shit!"

Voicemail #4:     "You know what I learned through this whole situation? People just want to pay for people like, 'aren't you so smart! You're so smart!' Sit there and fucking manipulate! And then there are those that just play along with the, 'Oh, you're so smart!' [Unintelligible.] But it's just like you look at my mom's side, fucking retarded cunt [unintelligible] brain cell and mentally retarded genes! I mean really what it comes down to is people that are smart, choose to fucking break free from this or fucking just end up killing themselves! 'Cause this shit fucking sucks! Because you fucking put me through this shit you fucking son of a bitch!"

Voicemail #5:     "Come on son of a bitch! Ruin my fucking life! Come on you fucking son of a bitch! You fucking piece of shit! Nigger. Come on! You fucking worthless coward! You stupid fucking retard! Come on! I have no future! There is no future for me because everybody else gets to fucking flash and [unintelligible] in their own fucking greed, you fucking piece of shit! And then act like, 'oh, Jonathan's environment was so fucking perfect!' Yeah, it was so fucking perfect, you dumb nigger! It was perfect! My environment was awesome! It was stellar, you dumb piece of shit! Fucking happy go and buy a dumb common cunt! Fucking stupid fucking piece of shit!"

*Count VI:  Felony Stalking*

After the initial charges in this case were filed in April 2015, Johnson was arrested and incarcerated while awaiting trial. In late April 2015, the district court ordered Johnson to have no contact with his father and released him on bond. However, Johnson eventually violated the conditions of his bond and was jailed again in December 2015. Throughout this time—and despite the district court's order—Johnson continued to contact his father. This contact resulted in the State charging Johnson with felony stalking in Count VI of the amended complaint.

At trial, Johnson's father testified that his son contacted him throughout 2015 and into 2016, even after the no contact order was in place. This contact contained similar types of derogatory, threatening voicemails to the ones that Johnson had previously left for his father. The State presented one of the voicemails from this time period, which Johnson was able to leave while in jail:

8

"I'm to the point I'm tired of you two taking advantage of my mother. You call the cops one more single time: Trust me. You don't wanna see what I can do. I'm tired of this. You don't want to listen to me and go to counseling and mediation. I tried screening you for it. You're arrogant. You have mental problems, [father]. You're a fucking mental case. You buy toy trains that are fucking child's play. You need to grow up and take responsibility, fucking fool! Fucking grow up!"

Johnson explained that his incarceration was a scary experience for him and that he continued to contact his father for emotional support during the incarceration. In fact, during Johnson's incarceration, Johnson's father accepted some phone calls from his son but then stopped accepting these calls.

Johnson's father testified that the voicemails concerned him because "the tone of voice and the content of them was threatening and derogatory and sounded like he would—wanted to do harm to me or myself. And I had some friends that had listened to them, and they felt there was a lot of anger being expressed by them." Johnson's father told the police that the emails and messages placed him in fear for his safety, enough so that he brought a loaded gun into his home for personal protection "in case [he] should be assaulted, in case [Johnson] should try to break into [his] home and do harm to [him]."

Johnson testified that he did not remember sending the emails or leaving any of the voicemails. However, he confirmed that it was his email address that the message came from and he recognized his voice on the voicemails. Johnson also admitted that he contacted his father after the district court issued the no contact order but testified that he was seeking emotional and financial support from his father and these emails and voicemails were his cry for attention.

*Johnson's Convictions and Sentence*

The jury acquitted Johnson of misdemeanor stalking in Count I but convicted him of the three counts of misdemeanor stalking in Counts II, III, and IV and the count of felony stalking in Count VI. The district court sentenced Johnson to six months in prison for felony stalking and eight months in the county jail for each of the three counts of misdemeanor stalking, with all misdemeanor sentences to run consecutively and with the misdemeanor jail terms to run concurrent to the felony prison term. However, the district court placed Johnson on probation from these sentences for 12 months and ordered that he serve his probation at the Johnson County Residential Center.

Johnson timely appeals.

DID SUFFICIENT EVIDENCE SUPPORT THE FELONY STALKING CONVICTION?

Johnson's first argument is that there was insufficient evidence to convict him of felony stalking. He bases his sufficiency of the evidence argument on three assertions. First, Johnson appears to argue that threats he made to harm himself cannot satisfy the statute's requirement that he threatened "the target person's safety or the safety of a member of the target person's immediate family." K.S.A. 2017 Supp. 21-5427(a)(1). Second, Johnson argues that because he was incarcerated during the time period alleged in the felony stalking count, and his father was aware of his incarceration, Johnson's father could not have had a reasonable fear for his safety. Third, Johnson argues that his father's "concerns" about his safety do not rise to the level of "fear" required by the statute.

"'When the sufficiency of the evidence is challenged in a criminal case, this court reviews the evidence in a light most favorable to the State to determine whether a rational fact-finder could have found the defendant guilty beyond a reasonable doubt.' [Citation

10

omitted.]" *State v. Rosa*, 304 Kan. 429, 432-33, 371 P.3d 915 (2016). "'In making a sufficiency determination, the appellate court does not reweigh evidence, resolve evidentiary conflicts, or make determinations regarding witness credibility.' [Citations omitted.]" *State v. Dunn*, 304 Kan. 773, 822, 375 P.3d 332 (2016). It is only in rare cases where the testimony is so incredible that no reasonable fact-finder could find guilt beyond a reasonable doubt that a guilty verdict will be reversed. *State v. Matlock*, 233 Kan. 1, 5-6, 660 P.2d 945 (1983).

"A conviction of even the gravest offense may be sustained by circumstantial evidence. Circumstantial evidence, in order to be sufficient, need not rise to that degree of certainty which will exclude any and every other reasonable conclusion. Instead, circumstantial evidence affords a basis for a reasonable inference by the jury regarding a fact at issue." *State v. Logsdon*, 304 Kan. 3, Syl. ¶ 3, 371 P.3d 836 (2016).

In order for the jury to find Johnson guilty of felony stalking as charged in Count VI, the State was required to prove beyond a reasonable doubt that Johnson:

"after being served with, or otherwise provided notice of, any protective order included in K.S.A. 21-3843, prior to its repeal or K.S.A. 2017 Supp. 21-5924, and amendments thereto, that prohibits contact with a targeted person, recklessly engaging in at least one act listed in subsection (f)(1) that violates the provisions of the order and would cause a reasonable person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear." K.S.A. 2017 Supp. 21-5427(a)(3).

The district court instructed the jury on the felony stalking count as follows:

"The defendant is charged with stalking. The defendant pleads not guilty.
"To establish this charge, each of the following claims must be proved:
"1. The defendant was served with a protective order prohibiting contact with [his father].

11

"2. The defendant thereafter recklessly:

a. Threatening the target person's safety or the safety of a member of the target person's immediate family;

b. Any act of communication.

"3. That act violates the protective order.

"4. That act would cause a reasonable person to fear his safety or the safety of a member of his immediate family.

"5. [Johnson's father] was placed in such fear.

"6. This act occurred over a period of time between the 30th day of April, 2015 and 13th day of February, 2016 in Johnson County, Kansas."

*Element 1: Johnson was served with a protective order.*

The first element of felony stalking required the State to prove that Johnson was served with a protective order prohibiting him from contacting his father. The parties stipulated to this order, and it was admitted into evidence. Johnson also admitted that he received the no contact order. Clearly, there was sufficient evidence that Johnson was served with the protective order.

*Element 2: Johnson threatened his father's safety in the voicemail.*

Second, the State was required to prove that Johnson recklessly threatened his father or the safety of a member of his father's immediate family through any act of communication. See K.S.A. 2017 Supp. 21-5427(a)(3), (f)(1)(G).

Although not explicitly argued, woven throughout Johnson's argument that there was insufficient evidence to support his felony stalking conviction is that he could not be convicted of felony stalking by threatening to kill himself because as the alleged perpetrator he could not also be classified as a member of his father's immediate family. While Johnson did make several threats to kill himself, these statements formed the basis

12

of his misdemeanor stalking counts, not his felony stalking count, which is the only conviction Johnson challenges on appeal. Accordingly, we reject this argument.

At trial, the evidence presented by the State to support felony stalking was as follows: Johnson's father testified that his son contacted him throughout 2015 and into 2016, even after the no contact order was in place. This contact was similar types of derogatory, threatening voicemails to the ones that Johnson had previously left for his father. The State presented one voicemail from this date range that Johnson left for his father in which Johnson said, in part: "You call the cops one more single time: Trust me. You don't wanna see what I can do. I'm tired of this." This statement, especially in light of all of Johnson's other statements and the hateful and acrimonious tone of Johnson's voice on the recording, constituted a clear threat to Johnson's father's safety. There was sufficient evidence to satisfy the second element of felony stalking.

*Element 3: Jonathan's acts violated the protective order.*

The third element of felony stalking required the State to prove that Johnson violated the protective order. See K.S.A. 2017 Supp. 21-5427(a)(3). The protection order admitted at trial clearly prohibited Johnson from making any contact with his father. Both Johnson and his father testified that Johnson contacted his father after the district court put the no contact order in place. We have no trouble concluding there was sufficient evidence to establish that Johnson violated the protection order.

*Element 4: Johnson's acts would cause a reasonable person to fear for his or her safety.*

To prove the charge of felony stalking, the State was required to prove that Johnson's acts towards his father would cause a reasonable person to fear for his or her safety. See K.S.A. 2017 Supp. 21-5427(a)(3). Johnson argues that because he was incarcerated during part of the time alleged in the felony stalking count and because his

13

father was aware of his incarceration, a reasonable person in his father's situation would not fear for his or her safety. However, "[s]talking does not require physical contact. Indeed, one of the purposes of the stalking statute is to criminalize behavior that impinges on one's privacy but which does not cross the line into physical contact." *State v. Whitesell*, 270 Kan. 259, 275, 13 P.3d 887 (2000).

Here, as is obvious from Johnson's relentless actions towards his father for more than a year—which involved numerous threats to his father, his father's fiancée, and Johnson's mother—a reasonable person could have feared for his or her safety when Johnson's actions continued after his incarceration. Johnson's father testified that the calls from his son during the relevant time period did not always have a message at the beginning indicating that the call was coming from a jail or another correctional facility. Perhaps more importantly, Johnson was released on bond and was not incarcerated during the entire time alleged in the felony stalking count. Without a disclaimer that the calls were coming from a jail, and given the fact that Johnson had previously been released on bond, a reasonable person could believe that Johnson was no longer incarcerated while awaiting trial.

Given the extensive history of Johnson's actions towards his father, this contact would place a reasonable person in fear for his or her safety. Such unrelenting contact, even if the perpetrator were unable to make physical contact with the victim, is clearly an impingement on the victim's privacy that the stalking statute intends to criminalize. See 270 Kan. at 275. There was sufficient evidence that Johnson's actions towards his father would have placed a reasonable person in fear for his or her safety.

*Element 5: Johnson's father was placed in such fear for his safety.*

The fifth element of felony stalking required the State to prove that Johnson's father was placed in fear for his safety. See K.S.A. 2017 Supp. 21-5427(a)(3). Johnson

argues that his father's concerns about his safety do not rise to the level of fear required by the statute. However, one officer testified at trial that Johnson's father was in fear for his safety. Moreover, Johnson's father brought a loaded gun into his home for personal protection "in case [he] should be assaulted, in case [Johnson] should try to break into [his] home and do harm to [his father]." Such actions show that Johnson's father was in fear for his safety because of Johnson's actions. There was sufficient evidence to support this element.

*Element 6: Johnson committed the crimes between April 30, 2015, and February 13, 2016, in Johnson County, Kansas.*

Finally, the last element of the felony stalking charge required the State to prove that Johnson committed the crime between April 30, 2015, and February 13, 2016, in Johnson County, Kansas. See K.S.A. 2017 Supp. 21-5427. The evidence presented at trial shows that Johnson continued to contact his father on his home phone located in the city of Leawood in Johnson County during the alleged time period. Given that the State satisfied all of the required elements of felony stalking as alleged in Count VI, there was sufficient evidence presented at trial that a rational fact-finder could have found Johnson guilty of felony stalking beyond a reasonable doubt.

DID THE DISTRICT COURT IMPROPERLY ANSWER A QUESTION FROM THE JURY?

In his second claim of error on appeal, Johnson argues the district court improperly answered a question from the jury. Specifically, he argues that the district court's answer to a question from the jury dissuaded the jury from asking further questions about the evidence and had the effect of preventing the jury from receiving information to which it was entitled. The following exchange occurred at trial:

15

"THE COURT: We're on the record in State of Kansas versus . . . Jonathan Paul Johnson, Case No. 15DV408. Defendant and all counsel are present in the courtroom. The jury is still in the jury room. We have another question from the jury which I will read. 'Could we please see the dates that these recordings were to have taken place? [T]he dates that were written on the microcassettes.' Which I believe was discussed in the direct testimony of Mr. Johnson.

"[THE STATE]: Judge, I don't believe that the jury was taking notes or given notebooks. I don't recall seeing—

"THE COURT: No.

"[THE STATE]: I think you just have to say please refer back to your recollection of the testimony and the instructions. I don't think you can do anything more than that.

"THE COURT: They can—I can tell them that you can request a readback of a witness, but I believe that we've got to have them read his entire testimony as opposed to a particular portion of it.

"[THE COURT]: Mr. Astrab.

"[THE DEFENSE]: I believe that might be the appropriate remedy, to tell them they would need to do a readback. If memory serves me, it may have also been Officer Craighead's testimony as well so they may need to go through both witnesses' testimony as well to get that information.

"THE COURT: What my proposal would be to respond to them, please refer to your recollection of the evidence or that you can request a readback of testimony of witnesses?

"[THE STATE]: In [its] entirety so they fully understand that it's several hours.

"THE COURT: Mr. Astrab.

16

"[THE DEFENSE]: Yes, sir.

"THE COURT: I'll respond back to the jury that way. Thank you."

The district court then submitted to the jury the following written answer: "Please refer to your recollection of the evidence. You can request a readback of a witness['] testimony in [its] entirety."

"K.S.A. 2016 Supp. 22-3420(d) provides that '[t]he court shall respond to all questions from a deliberating jury in open court or in writing.' When a party asserts the trial court's response to a jury's question was erroneous, appellate courts review the trial court's response for an abuse of discretion. *State v. Jones*, 41 Kan. App. 2d 714, 722, 205 P.3d 779 (2009). An abuse of discretion occurs when the trial court makes an error of law, an error of fact, or an otherwise unreasonable decision. *State v. Marshall*, 303 Kan. 438, 445, 362 P.3d 587 (2015). '[T]he crucial issue in reviewing a court's response to such a question is "whether it was a correct statement of the law as applied to the facts brought out in the evidence." [Citation omitted.]' *State v. Murdock*, 286 Kan. 661, 683, 187 P.3d 1267 (2008)." *State v. Wol*, No. 115,633, 2017 WL 3000839, at *2 (Kan. App. 2017) (unpublished opinion), *petition for rev. filed* August 3, 2017.

However, as the State correctly argues, a litigant may not invite error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). This rule reflects the common-sense notion that a party cannot complain to an appellate court about a ruling it has asked the district court to make. "If parties get what they ask for from district court judges, appellate courts will not reverse judgments against them even though they may think better of their requests on appeal." *State v. Hargrove*, 48 Kan. App. 2d 522, 531, 293 P.3d 787 (2013). Here, the district court stated its proposed response, and the State's attorney added that he believed the readback of any testimony would need to be in its entirety. The district court gave Johnson's counsel the opportunity to respond to this proposal, to which he responded, "Yes, sir." Even if we were to assume that the district court's response to the jury's question was error—which

17

we do not—Johnson's apparent agreement with the district court's response invited the court's actions, and such actions cannot now be complained of on appeal.

Affirmed.